1              IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF GEORGIA
2                      ATLANTA DIVISION

3

4   RUSSELL E. MARTIN, et al.,

5        Plaintiffs,

6   vs.                          CIVIL ACTION FILE NO.
                                 1:07-CV-00326-BBM
7   CITY OF ATLANTA, et al.,

8        Defendants.
    _____/
9
    DENNIS HAM, et al.,                      COPY
10
            Plaintiffs.
11
    vs.                          CIVIL ACTION FILE NO.
12                               1:07-CV-0309-BBM
    CITY OF ATLANTA, et al.,
13
            Defendants.
14  _____/

15                   DEPOSITION OF
              DAVID ALAN MACPHERSON, Ph.D.
16
            Taken on Behalf of The Plaintiffs
17
        DATE TAKEN:    September 29, 2008
18      TIME:          2:25 p.m. - 3:20 p.m.
        PLACE:         Holiday Inn Select
19                     316 West Tennessee Street
                       Tallahassee, Florida
20
         Examination of the witness taken before:
21
              RAY D. CONVERY, Court Reporter
22           For the Record Reporting, Inc.
               1500 Mahan Drive - Suite 140
23             Tallahassee, Florida, 32308

24

25

CITY OF ATLANTA
LAW DEPARTMENT

OCT 2 2 REC'D

RECEIVED

```
1    APPEARANCES OF COUNSEL:

2    On behalf of the Plaintiffs:

3    ANDREW Y. COFFMAN, ESQ.
     PARKS, CHESIN & WALBERT, P.C.
4    75 Fourteenth Street - Suite 2600
     Atlanta, GA 30309
5    Phone:  404.873.8000
     Fax: 404.873.8050
6    acoffman@pcwlawfirm.com

7    On behalf of the Defendants:

8    ROBERT N. GODFREY, ESQ.
     KRISTI D.A. MATTHEWS, ESQ.
9    City of Atlanta
     Suite 4100
10   City Hall Tower
     68 Mitchell Street SW
11   Atlanta, GA 30303-3520
     Phone:  404.330.6400
12   Fax: 404.658.6894
     E-mail: rgodfrey@atlantaga.gov
13   E-mail: kmatthews@atlantaga.gov

14   ALSO PRESENT

15   JANET R. THORNTON, Ph.D.
     ERS GROUP
16   4901 Tower Court
     Tallahassee, FL 32303
17   Phone: 850.562.1211 142
     Fax: 850.562.3838
18   E-mail: jthornton@ersgroup.com

19

20

21

22

23

24

25
```

```
1                    INDEX TO WITNESS

2   WITNESS                                    PAGE

3   DAVID MACPHERSON, Ph.D.

4        Examination by Mr. Godfrey            04

5                      * * *

6                   E X H I B I T S

7   NUMBER              DESCRIPTION            PAGE

8   1    Report by David A. Macpherson, Ph.D.   04

9   2    Report by Janet R. Thornton, Ph.D.     28

10
                       * * *
11
    Certificate of Oath                        36
12  Certificate of Reporter                    37
    Errata Sheet                               38
13  Read & Sign Letter to Witness              39

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    D E P O S I T I O N
 2   Whereupon,
 3             DAVID ALAN MACPHERSON, Ph.D.
 4   was called as a witness, having been first duly sworn to
 5   speak the truth, the whole truth, and nothing but the
 6   truth, was examined and testified as follows:
 7                       EXAMINATION
 8   BY MR. GODFREY:
 9      Q    All right, Dr. Macpherson, I'm Bob Godfrey,
10   and we've met before.
11      A    Yes.
12           MR. GODFREY:  I'll just go ahead and get this
13        show right on the road and hopefully we'll be out
14        of here in a hurry.  Let's mark that in the first
15        place in order.
16           (Whereupon, Exhibit No. 1 was marked for
17   identification.)
18   BY MR. GODFREY:
19      Q    All right.  I'm handing you what's -- what
20   appears to be your report prepared in this case, and you
21   can take a look at it and confirm that that is accurate.
22           Give us your full name, please.
23      A    David Alan Macpherson.
24      Q    All right.
25      A    It looks like my report.
```

1      Q      All right.  Now, what did you understand your

2    task to be in preparing this report?

3      A      To examine the statistical analysis of the

4    ratings and promotion decisions at the Atlanta Fire

5    Rescue Department --

6      Q      All right.

7      A      -- in respect to race.

8      Q      All right.  If you would turn to page four of

9    your report and Roman numeral III, Data Sources.  Now,

10   this indicates that you relied upon various documents

11   and information in compiling your report; correct?

12     A      That is correct.

13     Q      Is this the only information base that you

14   relied upon in preparing your report?

15     A      Yes, it is.

16     Q      Now, one of the things you indicate in

17   Footnote 1 to your data sources is that you did not have

18   all the personnel files; is that right?

19     A      That is correct.

20     Q      Did you ever get the remaining personnel

21   files?

22     A      I don't believe so.

23     Q      Now, turn to page five.

24     A      Yes.

25     Q      You indicate that the goal of your analysis is

1    to determine whether the promotional process reflects a

2    pattern attributable to chance alone or whether the

3    pattern suggests that the candidate's race influenced

4    the outcome.  Was that in fact your goal in doing your

5    analysis?

6         A    Yes.

7         Q    Did you not consider in your analysis if there

8    was something other than race to -- that could have

9    affected the outcome?

10        A    I was looking at a pool of people who are

11   eligible for promotion and looking amongst this eligible

12   pool and seeing whether it's chance or race that led to

13   differences in ratings or promotions.

14        Q    So in doing that, you assumed, I believe, that

15   the pool began with everyone being on an equal footing?

16        A    Yes.

17        Q    And, based on that analysis, your expectation

18   would have been what?

19        A    That the number of promotions would be

20   proportional by -- by race, there would be a proportion

21   of a given race in the promotion pool.

22        Q    And I believe in that analysis you believe

23   that, if the racial composition of the pool is

24   50 percent white, then the results would be 50 percent

25   white?

1    A    On average, yes.

2    Q    Now, "on average" means what?

3    A    Well, I mean, in any given promotion pool it

4  might be chance.  It might be higher than 50 percent.

5  It might be lower than 50 percent.

6    Q    And sitting here today, neither you nor I know

7  what that chance probability is; correct, that it may

8  not be 50-50?

9    A    No, I was expecting it to be proportional to

10  the pool, the distribution of race.

11    Q    Okay.  That's an expectation, but in the real

12  life of statistical analysis, that's rarely the

13  occasion; correct?

14    A    It depends on how big the sample size is.  If

15  have you a very large sample, it's more likely you're

16  going to get closer to the population average.

17    Q    Then the opposite is true, that in a small

18  sample, you're likely not to get close to that

19  proportion; correct?

20    A    That's correct.

21    Q    Now, in terms of your experience in this

22  field, do you consider the sample you were working with

23  a small sample, a large sample, or something in between?

24    A    A smaller sample.

25    Q    So that your expectation would not be

1    necessarily a 50-50 result if the beginning pool is

2    50-50?

3        A    There could be some variation around that

4    number.

5        Q    It could be 50-50, it could be something more

6    or less than that?

7        A    Right, due to chance, or it could be different

8    due to differences in discrimination.

9        Q    It could also be different due to other

10   factors other than race, correct?

11       A    It's possible.

12       Q    Did you consider any other factors other than

13   race?

14       A    No.

15       Q    Is there a reason you did not?

16       A    I didn't have any data for which to control

17   for it other than race.

18       Q    Did you ask for other data?

19       A    I asked for available data that would be

20   relevant to the analysis.

21       Q    What type of data?

22       A    Well, I don't know what the process was

23   involved, so I asked them to provide what would be

24   relevant to the promotion process.

25       Q    So in a situation like this where you're

1    looking at one factor other than chance, that being

2    race, your hypergeometric is the method you would

3    normally use for that; correct?

4        A    Yes, or I could use a PROBIT and get to very

5    similar answers.

6        Q    What about a multiple regression analysis?

7        A    You have to have appropriate controls to do

8    that.

9        Q    Such as?

10       A    It depends upon what -- the question you're

11   looking at.

12       Q    Well, for example, do you know if the age

13   groupings of the pools were the same?

14       A    No, I do not.

15       Q    Did you --

16       A    But I don't know if that's necessarily

17   relevant to promotion or not.

18       Q    Do you know that it's irrelevant?

19       A    No.  I mean, you could control for baseball

20   scores in Manila, if you wanted to, but that's not

21   necessarily relevant.

22       Q    Did you look at things like prior performance

23   reviews for the candidates?

24       A    I didn't have access to that.

25       Q    If you had access to that, would that have

1   been something you might have considered in your

2   analysis?

3       A    It's possible.  It depends if there was

4   discrimination in the awarding of those ratings.

5       Q    Did you look at things such as the amount of

6   time a candidate may have spent as a captain before the

7   promotional process?

8       A    No, because, again, I don't know what -- how

9   one would interpret that necessarily.  A long time might

10  be a signal that you're a not so good employee, or it

11  might be you're good.  It depends upon the promotion

12  possibilities in the past.

13      Q    Well, would you agree with me that, in doing

14  this analysis, if someone had been a captain for ten or

15  15 years when you had prior promotional opportunities

16  and he or she was not selected, that that might be an

17  indicator of that person's abilities?

18      A    Possibly, possibly not.  It depends upon what

19  was the process that was prior to this one.  Was it a

20  fair process or an unfair process?  Were there a lot of

21  openings in the past or not?  You can't make a blanket

22  statement.

23      Q    But you didn't look at any prior processes,

24  correct?

25      A    No.

1      Q     Did you consider that irrelevant?

2      A     You know, I was trying to look at this

3    particular process and just seeing whether this decision

4    process was neutral with respect to race.

5      Q     But wouldn't it have had helped in your

6    analysis to compare this process to the promotional

7    process that preceded it?

8      A     Not necessarily.  I mean, it's -- it could be

9    different decision-makers, and we're trying to see

10   whether this decision-maker had policies that were

11   neutral with respect to race.

12     Q     So I suppose in this situation you also did

13   not consider the relative education of the applicants?

14     A     No, I did not.

15     Q     If that information were available to you,

16   would it be something you could factor into your

17   analysis?

18     A     One could but, again, it's hard to know what's

19   the value of that necessarily.

20     Q     Well, isn't this exercise that you go through

21   in trying to determine the statistical significance

22   enhanced through a multiple regression analysis where

23   you eliminate all other factors than race?

24     A     You have to be careful because some of those

25   factors are influenced by discrimination or some other

1    factor, or factors are A, not relevant, or, B, they're

2    influenced by the discriminatory process, then you

3    definitely do not want to control for it.

4         Q    So are you suggesting to me that a straight

5    hypergeometric analysis is the best way to analyze this

6    process?

7         A    It will depend on the situation.

8         Q    Well, I'm speaking of this particular

9    situation.

10        A    The information I have available to me now,

11   yes.

12        Q    And again, you did not seek other information

13   from which you could do a multiple regression analysis;

14   correct?

15        A    I asked for all the relevant information to

16   this process that would be relevant, that was

17   quantifiable.

18        Q    Did you direct whoever you were seeking this

19   information from as to what would be and would not be

20   relevant?

21        A    I'm sure we had some discussions.  I can't

22   remember the exact conversations.

23        Q    Well, I guess what I'm getting at is who made

24   the determination as to relevancy; did you?

25        A    Well, I found out there was actually very

1    little that was available that was quantifiable.  The

2    records were not available with much detail on these

3    personnel.

4         Q    You did get the personnel files of some of the

5    captains?

6         A    I think that's true.

7         Q    That's in your Footnote 1?

8         A    Yeah, I'm trying to remember.  It's been a

9    while since I've done that.

10        Q    I think in Footnote 1 you say you got some of

11   them, not all of them?

12        A    Yeah, I think that's true.

13        Q    Did you do anything at all with those

14   personnel files?

15        A    No.  One would have to have a complete set to

16   make it useful.

17        Q    Did you request a complete set?

18        A    I think we did.  I can't remember exactly.

19        Q    And were you then told that the complete set

20   was not available for your analysis?

21        A    Yeah, I think that's my recollection.

22        Q    Is it your understanding that -- sitting here

23   today, that a complete set of personnel files is still

24   not available?

25        A    I have not talked about the personnel files in

1    a long time.

2         Q     But let's assume hypothetically that you had

3    the complete set of personnel files for all the

4    candidates.  Would that be a body of information that

5    you could find useful in analyzing this selection

6    process?

7         A     Possibly, but maybe not because, again, it

8    depends upon what kind of process was involved before in

9    terms of people's assigning of ratings.  Was there

10   discrimination in assigning of previous ratings, for

11   example?  So it may have information, but it may not be

12   usable in this analysis.

13        Q     Well, you could separately evaluate the

14   statistical significance based on race for previous

15   ratings, performance reviews; could you not?

16        A     It was -- I don't know what the

17   decision-makers were in the previous cases.

18        Q     Well, assume, hypothetically again, that the

19   previous decision-makers or decision-maker was one

20   individual.

21        A     The same person who's involved in this

22   lawsuit?

23        Q     Not the same person involved in this lawsuit.

24        A     Well, that's not -- I would not find that

25   necessarily relevant.

1      Q      Why not?

2      A      Because what matters is this decision process

3   is was this process neutral with respect to race?   And

4   whether a previous person was neutral isn't really

5   relevant to this case.

6      Q      But if the previous person's decisions were

7   neutral, would not the performance reviews that resulted

8   from that neutral selection process be a factor that you

9   would want to look at in determining whether this

10   decision-maker made statistically significant racial

11   decisions?

12      A      I would have to get more detail before I could

13   give a concrete answer on that.   I'd have to know more

14   details about these ratings that were given by previous

15   raters.

16      Q      But things like age and education are not

17   things that would be influenced by a previous

18   discriminatory intent by a decision-maker, correct?

19      A      Well, age obviously can't be.   It depends on

20   the hiring process of the person before in terms of

21   education.   It could be somebody was discriminating in

22   favor of higher- or lower-education workers.

23      Q      Have you evaluated a fire department selection

24   processes at any other time other than this case?

25      A      No.

1    Q    Have you evaluated any public safety agency's

2    selection process other than in this case?  And by

3    "public safety," I would mean police, fire or

4    corrections agencies.

5    A    Yes; yes, I have.

6    Q    When was that and what was the agency?

7    A    Well, actually it was a security officer at

8    Tallahassee Community College.

9    Q    Is that one of the cases you have listed?

10   A    Yeah, it's Case No. 8.

11   Q    Okay.  What did you do in that case?

12   A    I honestly don't remember the details.  It was

13   over four years ago.

14   Q    Did you do a statistical analysis?

15   A    I think it was calculating damages in that

16   case, actually.

17   Q    So you have no previous experience in

18   analyzing a case in which the selection process for a

19   public safety agency was involved other than this case?

20   A    I think that's correct.

21   Q    Now, you have been fairly prolific in

22   publishing based on your resumé, and I have looked

23   through your various publications but cannot determine

24   from looking at them whether any of them involve

25   evaluations of selection processes.  Can you help me to

1    identify such publications?

2        A    I guess -- what do you mean by "selection

3    processes"?

4        Q    Hiring, promotions.

5        A    I don't have any articles that directly

6    address the issue of hiring or promotions, though the

7    analysis involved is either you get promoted or you

8    don't get promoted, so a limited dependent variable

9    problem, which I've done numerous times in numerous

10   articles.  So the methodology one would typically employ

11   in analyzing whether one got promoted or not

12   statistically is very similar to whether one has, for

13   example, a pension or not.  It would be like a PROBIT

14   analysis, which I typically use.

15       Q    Well, I thank you for that answer, but the

16   answer to my question about whether any of your

17   publications were with regard to the selection processes

18   of promotions or hiring, the answer is no?

19       A    I said yes, that's correct.

20       Q    Would that hold true for your publications in

21   the category listed under books?

22       A    Yes, it would.

23       Q    Would it hold true for your trial testimony?

24       A    I've done previous cases involving promotions

25   and selection.

```
 1      Q    Are they -- any of these listed here under
 2  your trial testimony?
 3      A    Yes, they are.
 4      Q    Would you point those out to me?
 5      A    Debbie Suboh vs. BellSouth, No. 11.
 6      Q    All right.  Let's stop and talk about that
 7  one.  Tell me what that case involved.
 8      A    That involved age discrimination and an
 9  allegation against BellSouth.
10      Q    Was it an allegation of a failure to hire or a
11  failure to promote?  Which one?
12      A    It was a firing.
13      Q    It was a termination?
14      A    A termination, yeah.
15      Q    So when you say selection process, it was
16  selection for termination?
17      A    Right.
18      Q    And was it the termination of a single
19  individual?
20      A    Yes, it was, but the analysis was done by age
21  group for the entire eligible pool.
22      Q    What methodology did you use?
23      A    Hypergeometric.
24      Q    And were you working for the plaintiff at that
25  time?
```

```
 1       A     Yes, I was.

 2       Q     All right.  What's your next case involving a

 3   selection process?  And by "a selection process," let's

 4   limit it to promotions or hiring.

 5       A     My other selection cases are all involving

 6   wrongful termination.

 7       Q     All right.  One of the courses you teach is

 8   Labor Economics, is that correct?

 9       A     That's correct.

10       Q     Do you use a textbook for teaching that

11   course?

12       A     Which labor, my undergraduate or my Ph.D.

13   level?

14       Q     Under teaching areas, it says "Labor Economics

15   and Labor Relations, Undergraduate and Graduate."

16       A     I am co-author of a labor economics textbook

17   at the undergraduate level, and I use that when I teach

18   my Labor Economics class at the undergraduate level, and

19   I use that as a backup reference in my Ph.D. course.

20       Q     Which treatise is that?

21       A     Contemporary Labor Economics.

22       Q     In your Contemporary Labor Economics book and

23   courses, do you ever address the issue of use of the

24   Yates Correction for Continuity?

25       A     It's not in my undergraduate labor economics
```

1   textbook, and I've looked at all the other ones, and the

2   Yates Continuity Correction is not included as a topic

3   in any of those books.

4       Q    Now, you were in here for the discussion of --

5   let's call it Yates for a short term.  You heard the

6   discussion of Yates with Dr. Thornton.  Do you have a

7   different perspective than hers as to when and to what

8   extent the Yates should be used?

9       A    Yes, I do.

10      Q    Tell me what that is.

11      A    The Yates Correction, Continuity Correction

12  should only be used in certain cases, and it's been

13  criticized, in particularly the Fleiss article, and

14  particularly it's been criticized by Mark Havilland in

15  his article, saying it's overly conservative, and it's

16  only appropriate in certain cases to use the Yates

17  Continuity Correction.

18      Q    All right.  Let's start with "overly

19  conservative."  Tell me what that means to you.

20      A    That means that it's too few standard

21  deviations or too high a P value.

22      Q    When you're doing statistical analysis, from

23  your perspective, are you intentionally trying not to be

24  conservative in your analysis?

25      A    Well, being -- you can be -- no.  I mean, what

1    you're trying to do is be -- what's appropriate

2    technique for the problem you're addressing.

3        Q    Why is Yates not an appropriate technique for

4    the analysis done in this case?

5        A    Well, because the Yates Correction is only

6    supposed to be done when both the rows and the columns

7    are pre determined, that is -- there's a nice article in

8    the journal *JASA* which outlines the points -- the cases

9    when it should be used and when it should not be used.

10   And he argues that, you know, it's only really

11   appropriate when the rows and the columns are

12   pre determined and the sample sizes in each of the cells

13   are equal.   In other words --

14       Q    Yeah.   Please break that down for me.

15       A    Okay.   So you've got -- we have that previous

16   exhibit that Mr. Coffman had, I believe.

17            MR. COFFMAN:   Exhibit No. 2.

18            THE WITNESS:   Yeah, very similar to this.

19       When C1 equals C2 and N1 equals N2, and the numbers

20       in C1 and C2 and N1 and N2, those totals are

21       pre determined.

22   BY MR. GODFREY:

23       Q    Okay.   I'm not following you.   Can you give me

24   a numerical example of what you're talking about?

25       A    Let's say you have 40 observations.   You have

1   to have ten -- there has to be 20 in row totals for N1,

2   so there will be 20 here.  There would have to be 20

3   here, so the total will equal 40, N1 equals N2.  You'd

4   also have to have C1 equals C2, that each also have to

5   equal 20, okay.  So you have to have that as a first.

6   You have to have the totals equal.  Second, they've got

7   to be pre determined prior to doing the analysis, what

8   those numbers are.  For example, if you're doing a

9   promotion pool and you've got 20 blacks and 20 white

10  people, that will be pre determined, okay, but then you

11  have to have the outcomes, the number of promotions

12  pre determined in advance before it would be

13  appropriate, and the cell sizes would have to be equal.

14  And Conover argues that in fact that that would be

15  appropriate in most cases.

16          Now, if only one of the totals are equal,

17  right, in terms of pre determined, then in fact it would

18  not be -- it would be not very useful, and he argues

19  they are overly conservative.  And then Havilland also

20  criticizes Fleiss in particular as being overly

21  conservative in the analysis.

22      Q    All right.  Are there other articles out there

23  that endorse the use of Yates in situations other than

24  this?

25      A    Yeah.  Well, there are -- for example,

1   Havilland cites in this article 12 people who in fact

2   argue that in fact the Yates Continuity Correction is

3   inappropriate.

4   Q   Well, are you telling me that all the

5   literature that you have reviewed suggests that Yates is

6   inappropriately used in the situation like the one we

7   have before us?

8   A   For the articles that -- there's a lot of

9   articles that argue that.  I mean, to summarize Mark

10  Havilland's summary, he says, "Despite recommendations

11  to the contrary, medical researchers still routinely use

12  the Yates-corrected chi-square statistic in analyses of

13  two-by-two contingency tables.  Research has shown that

14  these corrected statistics are overly conservative and

15  that the Pearson chi-square generally provides adequate

16  control over type I error probabilities."  That's his

17  summary.

18  Q   All right.  Do you have any reference that

19  applies that theory to promotion or hiring processes?

20  A   It's not really a -- what matters is what are

21  the totals in the columns?  Are they pre determined?

22  Are they of equal size?  It's irrelevant whether it's

23  promotions or you're talking about radar guns.  What

24  matters is how are the experiments set up.  That's what

25  matters.

1      Q     But can you point me to any reference that

2  says that with regard to employment selection processes?

3      A     Maybe I'm not being clear.

4      Q     You're clear to me that in your mind it

5  doesn't matter because the methodology is what's at

6  issue.

7      A     Exactly.

8      Q     What I am asking you is, can you relate that

9  theory of inappropriateness to an analysis of any

10  selection process for hiring or promotion?  Is there an

11  article out there that you have read and rely upon to

12  say that Yates is inappropriate specifically in a

13  promotion or hiring process?

14      A     No, because all these other statistical

15  articles say the methodology is inappropriate except in

16  certain cases.  I mean, it would be very difficult to

17  get an article published when a dozen other people have

18  said this technique is not appropriate in a lot of

19  cases, to say, okay, well, in this particular case of

20  promotions, it's also inappropriate.  I mean, it's like

21  saying, well, it's not appropriate in analysis of radar

22  guns.  Okay, let's have an article on that.  That would

23  be crazy.

24      Q     All right.  But are there other articles out

25  there that you have read that have a different opinion

1   of the use of the Yates?

2       A    Oh, yeah.  Havilland talk about some people,

3   Fleiss, for example, who he criticizes as being in favor

4   of it, sure.

5       Q    So the literature is not 100 percent against

6   the use of Yates, correct?

7       A    Oh, I wouldn't say it's 100 percent.  *JASA* is

8   a really top journal, and for them to have an article

9   coming out saying that it's not appropriate and other

10  followup articles, a dozen other people, certainly casts

11  doubt on the use of Yates except in certain cases it is

12  appropriate.  It's not like, as I think Dr. Thornton

13  said, quote, Fleiss said it should be always used.  I

14  mean, Fleiss may say that, but Fleiss has been

15  criticized.

16      Q    In the area in which you practice, teach and

17  have studied, when articles are written within the

18  profession, are they ever criticized by others in the

19  profession?

20      A    Sure some are.  And, as I said, 12 -- at least

21  12 articles cited by Havilland criticize the use of

22  Yates.

23      Q    Have you written any articles or other

24  publications criticizing the use of Yates?

25      A    No, I have not.

1       Q     Let's talk about your PROBIT analysis of the

2    two years combined.

3       A     Yes.

4       Q     What is it that brought you to the conclusion

5    that such an analysis was appropriate in this case?

6       A     That there's one decision-maker ultimately

7    deciding whether someone gets promoted or not, that

8    being Dennis Rubin.

9       Q     But that's it?

10      A     Well, that's a major part of the issue is put

11   the two pools -- I combined and included a control for

12   the fact which pool you're in.

13      Q     What does that mean?

14      A     Well, statistically, if there's higher or

15   lower probability of getting promoted in 2007 versus --

16   I guess you'd call it 2006 than the 2004 pool, I've

17   controlled for that difference in the promotion process.

18      Q     Did you also control for the fact that the

19   applicants or some of the applicants in 2004 were some

20   of the same applicants in 2006?

21      A     Yes, I did.

22      Q     How did you do that?

23      A     I adjusted the standard errors for clustering,

24   which accounts for the fact that one person's rating or

25   probability of getting promoted is related to the

1    previous period.

2        Q    So that was important to you in this analysis

3    because it involved the same decision-maker, but it

4    wasn't important to you that the same individuals had

5    been passed over in the previous promotions by other

6    decision-makers?

7        A    I wasn't looking at previous decision-makers.

8    I was looking at this particular decision-maker, and

9    what matters to me is what -- the choices he made.

10        Q    But assume for me for a moment that individual

11    X who appears in the 2004 pool, appears in the 2006 pool

12    had also been considered for appointment in pools prior

13    to that time and still had not been promoted by a

14    different individual.  That would not matter to you?

15        A    Again, I don't know what the -- how the

16    previous processes were done.  Maybe it's the same or a

17    different sort of discrimination going on in previous

18    years, and so let's say this process was discriminatory

19    in the past.  Well, one shouldn't control for that

20    discriminatory process in the current period.

21        Q    Well, but wouldn't that be something you'd

22    want to know in looking at this process to determine

23    whether the previous processes were in fact

24    discriminatory, statistically speaking?

25        A    I'd have to look at the data to see what was

1   going on.  I'm not sure.

2        Q    Now, in addition to applying the Yates

3   analysis to your conclusions, Dr. Thornton did some

4   other analyses of her own unrelated to what you had

5   done.  Do you have any opinion -- and I'll give you a

6   copy of hers -- any opinion whatsoever as to her choice

7   of methodology or the methodology itself?  Mark that

8   next in order, please.

9             (Whereupon, Exhibit No. 2 was marked for

10  identification.)

11            THE WITNESS:  Thank you.

12            Well, what Dr. Thornton does is she controls

13        her rating to see whether -- to see -- and then

14        looks at the decision process from amongst those

15        people who got -- for example, in Table 4, looks at

16        those with an outstanding rating and see whether

17        they got promoted.

18  BY MR. GODFREY:

19        Q    All right.

20        A    And the problem I have with that is that the

21  rating process, again, is -- could be discriminatory.

22        Q    It could be.

23        A    Yeah, and there is some evidence that the --

24  anecdotal evidence that the Chief promoted somebody from

25  one category up to a higher category on his orders,

1    shifted them from well-qualified to qualified, and in

2    addition, I understand that he met with the assessment

3    panel to tell them what he wanted in the process, and

4    so, if he was encouraging discrimination in that

5    process, then one would not want to control for rating

6    in doing the analysis.

7        Q    Did you review any of the deposition testimony

8    of the raters themselves?

9        A    No, I have not.

10       Q    So you have no anecdotal evidence that any of

11   the raters themselves applied any discriminatory bias in

12   the selection process, do you?

13       A    Not personally, no.  I understand from

14   counsel --

15       Q    I don't want to know what you understand from

16   counsel.  I want to know what you have looked at and

17   what you have considered.

18       A    I have not read those depositions.

19       Q    So, other than the fact that Chief Rubin may

20   have met with the panel and may have moved one person

21   from highly-qualified to outstanding, what else gives

22   you a problem with the analysis of Table 4?

23       A    That it's a subjective rating.  I mean, it's

24   not based on any quantifiable test.  It's just someone's

25   opinion.  It could be influenced by the chief.

     1          Q     So you've made an assumption that the Chief

     2    influenced the outcome?

     3          A      Influenced the ratings, and there is anecdotal

     4    evidence, I think it's in both periods, that the Chief

     5    moved somebody up from well-qualified to outstanding,

     6    and --

     7          Q     Well, let's not talk "some evidence."  What

     8    evidence is there of that?

     9          A      I understand from counsel that in both pools

    10    there's at least one person --

    11          Q      I want to know what you have looked at and

    12    you're considering other than what your counsel has told

    13    you in making these -- drawing these conclusions.

    14          A      I have not seen any evidence.

    15          Q      All right.  Do you have problems with any

    16    other parts of her report?  Not necessarily problems,

    17    but do you disagree?

    18          A      The other question is this Mr. Day's

    19    promotion.  I understand Ms. Thornton said that she

    20    got -- he got provisionally promoted in August of '07.

    21          Q      You have information different from that?

    22          A      I understand from counsel that in fact it was

    23    provisional in April and he was promoted permanently in

    24    August.

    25          Q      So your understanding is, without having seen

1    anything that justifies that, that the provisional

2    promotion was in April?

3        A    That's my understanding.

4        Q    And did you consider his provisional promotion

5    in April as part of your analysis?

6        A    Yes.  I included him as a permanent one since

7    he got promoted in August, and I also redid the analysis

8    excluding Mr. Day from my analysis, and the conclusions

9    are unchanged.

10       Q    Which one of your analyses would involve the

11   inclusion of Mr. Day as provisional?

12       A    Table 2 --

13       Q    And which --

14       A    -- and Table 3.

15       Q    And which would include Mr. Day as not being a

16   part of the pool?

17       A    I've redone Table 2 and redone Table 3 to not

18   count Mr. Day as a promotion, and they do not change the

19   answer, I mean, with regards to statistical

20   significance.

21       Q    Not even by a 100th of a standard deviation?

22       A    Well, it's whether it's statistically

23   significant or not.  It does change the number of

24   standard deviations.

25       Q    Well, I think in your analysis you refer to

1    above two standard deviations as being significant;

2    correct?

3        A    That's right.

4        Q    Isn't the standard from two to three standard

5    deviations for significance in employment cases?

6        A    Well, it's two to three, so it's above two.

7    That's between two and three.

8        Q    But something under three isn't necessarily

9    statistically significant in an employment case, is it?

10       A    Three standard deviations, even if it's like

11   2.7 is going to get you a one-in-100 chance, and that's

12   pretty low odds due to chance.

13       Q    Again, that may hold true in a large pool, but

14   it isn't necessarily so in a smaller pool such as what

15   we're dealing with here?

16       A    No, it's -- no, you're wrong on that.  What

17   matters is the probabilities, and if the probability is

18   one-in-100 in a small pool, it's still a one-in-100

19   chance.  The number of standard deviations is not going

20   to be a function of the sample size, whether it's

21   statistically significant or not.

22       Q    It's measuring deviation from probability?

23       A    Right.  So, if it's a sample size of 40 or

24   40,000, if it's 2.5 standard deviations, it's 2.5

25   standard deviations.

```
 1       Q     So in your mind 2.5 deviations in a sample
 2  size of 100,000 is no different than the same standard
 3  deviation in a sample size of 40?
 4       A     The same P value.
 5       Q     No other significant difference?
 6       A     Well, I mean -- no, that's -- let me be
 7  careful.  When you get past 100, there will be no
 8  difference.  In very small sample sizes, a -- you'll
 9  need a higher number of standard deviations to have the
10  same P value.
11       Q     And if you had to explain that in layman's
12  terms, how would you explain that, or is there an
13  explanation in layman's terms?
14            MR. COFFMAN:  I hope so.
15            THE WITNESS:  Yeah, if you had a sample size
16       of two or three, two or three standard deviations
17       would have a P value that would be larger than it
18       would be if you say it had 40 or 100.
19  BY MR. GODFREY:
20       Q     All right.  I think the example you used was,
21  under 100, there's a difference, over 100, there is no
22  difference.  Where under 100 is there going to be
23  statistical significance that means anything to us?
24  What's the size of that sample?
25       A     Well, it's not going to be continuous -- it's
```

1   going to go down on a -- if you start with a sample size

2   of two -- I don't know what the tables are off the top

3   of my head, but it will be a higher number, maybe four

4   to get a five-percent P value.  I'm not sure of the

5   exact number, but then when you got down to a sample

6   size of 100, it would be an about 1.96 to get a

7   five-percent significance level.  In other words, it

8   will drop down pretty steeply.

9        Q    All right.  Have we talked about every

10  criticism that you may have of Dr. Thornton's report?

11  We've talked about Yates and we've talked about the

12  couple of tables.  Is there anything else?

13       A    Not that I'm aware of right now.

14       Q    Have you been asked to do any further analysis

15  of the data in this case from a statistical perspective?

16       A    I was asked to leave out Mr. Day's promotion

17  and see how that would change the analysis.

18       Q    Anything else?

19       A    No.

20            MR. GODFREY:  All right.  Let's take a break.

21            (Whereupon, a recess was had in the

22  deposition.)

23  BY MR. GODFREY:

24       Q    Back on the record.

25            You've referred to a couple of articles in

1    your testimony.  Could you give me the names and authors

2    and dates of those articles?

3         A    You can have these copies.

4         Q    Okay.  Great.  Let's --

5         A    Does that count as a question?

6         Q    That was question number one.

7              All right.  It looks like the title of the

8    article is *Some Reasons for Not Using the Yates*

9    *Continuity Correction on Two-by-two Contingency Tables,*

10   by W.J. Conover, C-o-n-o-v-e-r, *Journal of the American*

11   *Statistical Association,* June, 1974, Volume 6, No. 346,

12   Theory and Methods Section.  And that's all I have.

13              MR. COFFMAN:  That's it?  I have no questions.

14              MR. GODFREY:  Oh, I'm sorry, there's another

15         one, two of them.  Back on the record.  The second

16         article, *The Yates Correction for Continuity and*

17         *the Analysis of Two-by-Two Contingency Tables* by

18         Mark J. Havilland, *Statistics in Medicine,* Volume

19         9, pages 363 through 367, 1990, received July 1988,

20         revised March, 1989.  All right.  Now we're done.

21              MR. COFFMAN:  And I have no questions.  We

22         will reserve the read and sign.

23              (Whereupon, the witness did not waive reading

24   and signing of the deposition and the deposition was

25   concluded at 3:20 p.m.)

```
 1                    CERTIFICATE OF OATH

 2

 3   STATE OF FLORIDA

 4   COUNTY OF LEON

 5

 6       I, RAY D. CONVERY, the undersigned authority,

 7   certify that DAVID ALAN MACPHERSON personally appeared

 8   before me and was duly sworn.

 9

10       WITNESS my hand and official seal this 20th day of

11   October, 2008.

12

13

14

15       _____

16                    RAY D. CONVERY

17

18

19

20                         .

21

22

23

24

25
```

```
1                    CERTIFICATE OF REPORTER

2

3     STATE OF FLORIDA      )

4     COUNTY OF LEON        )

5

6              I, RAY D. CONVERY, do hereby certify that I

7     was authorized to and did stenographically report the

8     deposition of DAVID ALAN MACPHERSON; that a review of

9     the transcript was requested; and that the foregoing

10    transcript, pages 1 through 36, is a true record of my

11    stenographic notes.

12             I FURTHER CERTIFY that I am not a relative,

13    employee, or attorney, or counsel of any of the parties,

14    nor am I a relative or employee of any of the parties'

15    attorney or counsel connected with the action, nor am I

16    financially interested in the action.

17

18             DATED  this 20th day of October, 2008 at

19    Tallahassee, Leon County, Florida.

20

21

22

23             _____

24                         RAY D. CONVERY

25
```