```
 1                 IN THE UNITED STATES DISTRICT COURT
                  FOR THE NORTHERN DISTRICT OF GEORGIA
 2                          ATLANTA DIVISION

 3   RUSSELL E. MARTIN, et al.        )
                                      )
 4                  Plaintiffs,       )    CIVIL ACTION FILE
                                      )    NO. 1:07-CV-326-WSD
 5   v.                               )
                                      )    ATLANTA, GEORGIA
 6   CITY OF ATLANTA, GEORGIA, et al. )
                                      )
 7                  Defendants.       )
     _____)
 8

 9                     TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE WILLIAM S. DUFFEY, JR.,
10                   UNITED STATES DISTRICT JUDGE

11                     Monday, August 12, 2013

12


13

     APPEARANCES OF COUNSEL:
14
     For the Plaintiffs:         PARKS CHESSIN & WALBERT
15                               (By:  Andrew Yancey Coffman
                                       Larry Allen Pankey)
16
     For the Defendants:         CITY OF ATLANTA LAW DEPARTMENT
17                               (By:  Robert N. Godfrey
                                       LaShawn W. Terry
18                                     Tamara Nikki Baines
                                       Kristi D. A. Matthews)
19


20


21           Proceedings recorded by mechanical stenography
               and computer-aided transcript produced by
22                   NICHOLAS A. MARRONE, RMR, CRR
                        1714 U. S. Courthouse
23                      75 Spring Street, S.W.
                         Atlanta, GA  30303
24                        (404) 215-1486


25
```

I N D E X

                                                    Page

      Motions in limine                             4

      Voir Dire matters                             5

      Limiting Instructions                         47

      Review of Trial Procedures                    51

      Colloquy with the Attorneys                   58

```
1                      Monday Afternoon Session

2                         August 12, 2013

3                           2:10 p.m.

4                         -- -- --

5                P R O C E E D I N G S

6                         -- -- --

7                      (In chambers:)

8            THE COURT:  This is the pretrial conference in

9    Martin, et al., versus the City of Atlanta and Chief Rubin,

10   which is Civil Action No. 07-326.

11           Would counsel announce theirs appearances, please?

12           MR. COFFMAN:  Andrew Coffman for the plaintiffs.

13           MR. PANKEY:  Larry Pankey for the plaintiffs.

14           MS. MATTHEWS:  Kristi Matthews for the defendants.

15           MS. BAINES:  Tamara Baines for the defendants.

16           MS. TERRY:  LaShawn Terry for the defendants.

17           MR. GODFREY:  Robert Godfrey for the defendants.

18           THE COURT:  Okay.  So who is going to be in charge

19   for each side or speak for each side?

20           MR. COFFMAN:  I think we have some assigned tasks.

21   Conversation about jury questionnaires will be Larry.

22           THE COURT:  Good.

23           MR. COFFMAN:  And also our response to the motion

24   in limine the city filed will be Larry.

25           THE COURT:  All right.  And for the city?
```

1           MR. GODFREY:  Ms. Baines and LaShawn are going to

2      be handling most of the discussion.

3           THE COURT:  Okay.  Well, there is not much to say

4      in the motion *in limine* since I entered an order on those

5      today, so you should each get that.  I addressed each of

6      your -- each of you had four different categories of evidence

7      that you wanted me to address, and so that you should have

8      when you get back to your office.

9           So I thought it would be better for me and

10     I thought it would be better for you to have something in

11     writing.

12          There were some issues which I deferred because

13     I need context for the rulings.  Some I actually ruled on, so

14     it will give you a road map of what we will need to do and

15     how I would like to deal with those things for which I need

16     more context.

17          My preference would be to do that early in the

18     trial, maybe the first evening or the second evening, we will

19     take proffers on that so that I can understand exactly what

20     the evidence is that you want to keep in or get out -- or

21     take out.

22          I found it was a little short on some specifics in

23     the submissions, and the best way to handle that was not to

24     reach a decision and decide that once I had a better

25     record.

1          So you will get that, so we won't be addressing

2     those today since we did give you something in writing.  It's

3     about thirteen pages long.

4          So -- and I don't think there were any other

5     pending motions other than the motions *in limine* that had

6     been filed, but I want to make sure I didn't miss anything.

7     Is there?

8          MR. COFFMAN:  I don't think.  I'm not aware of any

9     other motions.

10          MR. GODFREY:  No, we don't have any.

11          THE COURT:  All right.  Then let's turn to the

12     conduct of the trial, and specifically what I think is going

13     to make this case easier as far as selecting a jury.

14          I spent a good part of the weekend reading all the

15     questionnaires myself, and so I understand -- I actually

16     understand the complexion of the panel members.  It's an

17     interesting group of people that have been called.

18          There are some things which I think require

19     follow-up, but I was a little surprised when -- we asked for

20     a fair number of -- more than we would normally ask for in a

21     civil trial because of the nature of this case.  I actually

22     thought there would be a lot more controversial answers and

23     was surprised there weren't.  So this in fact might have

24     worked out well.

25          And I have an idea on how we might manage the

1   follow-up process so that we don't end up as sometimes we do

2   asking follow-up questions of people who were never within

3   the pool from which to exert exemplary -- or peremptory

4   challenges.

5          So I think what I would like to do first is let's

6   talk about the questionnaires and those people for whom you

7   want to follow up.

8          And then there are a couple of people that in their

9   questionnaires and otherwise reported to the jury office that

10  have conflicts that I thought we should address and see if we

11  can just release them.

12         And the people I have identified or were identified

13  to the jury office is -- first is Juror No. 2.

14         And this is in the catch-all question about is

15  there anything else you think that I should know, and he

16  wants us to know that this is a burden on he and his company,

17  and I think it's more focused on his absence and the

18  additional burden it imposes upon other people at his

19  company.

20         His name is Jeffrey Rutkowski, and the answer that

21  I identified was his answer to Question No. 68.

22         Have you all looked at that?

23         MS. BAINES:  Yes.

24         MR. GODFREY:  We did.

25         THE COURT:  And do you have thoughts on him?

1          MS. TERRY:  No objection to releasing him.

2          MS. BAINES:  No.

3          MR. PANKEY:  I guess our response would be I don't

4    know that that's a valid excuse.  I mean, potentially he's a

5    middle-of-the-road juror it looks like for us where he might

6    sit.

7          THE COURT:  Well, the only reason why -- and I will

8    agree with you, normally I would not allow this to be an

9    excuse.  But we have got so many people.

10          MR. PANKEY:  Sure, sure.

11          What do you think?

12          THE COURT:  And I think he is the only one that

13    falls into this category of business hardship.  And

14    I probably would have felt different about this if this was a

15    case that was tried before 2007.

16          MR. PANKEY:  I liked him as a potential juror for

17    us because he said Reed is okay, I guess, for the City of

18    Atlanta.  So that being equivocal -- I think it's not really

19    equivocal, he might have a problem with the City of Atlanta

20    which might favor our case.

21          THE COURT:  I actually read that a different way.

22          MS. TERRY:  Yeah, I did too.

23          THE COURT:  Well, if you object, I don't think that

24    there is grounds for cause.  It would have to be consensual,

25    so if you object then we will keep him in the pool.

1           MR. PANKEY:  And if I could talk with Andy about

2   that, he might change my mind as well.

3           THE COURT:  Well, you could always circle back with

4   me tomorrow, that would be fine.

5           MR. COFFMAN:  Yeah.

6           THE COURT:  All right.  The next is Juror 7,

7   somebody whose reason I'm extremely sympathetic to is -- and

8   I think his surgery is a rotator cuff.

9           MR. COFFMAN:  It's on the 27th.

10          MR. PANKEY:  Rotator cuff, and the preop is on the

11  20th.

12          THE COURT:  Yeah.  What's the parties' response to

13  this fellow?

14          MS. BAINES:  We would prefer to keep him in.

15          THE COURT:  Because?  Oh, so you want to let

16  somebody go that has a little business conflict, and somebody

17  who has orthopedic surgery you don't?  It's actually telling

18  me a lot about your litigating positions and also a lot about

19  your humanity.

20          MS. TERRY:  He seemed favorable to the city.  That

21  was one of the reasons why we didn't want to let him go,

22  but --

23          MR. GODFREY:  We won't object.

24          THE COURT:  How about for the plaintiffs?

25          MR. COFFMAN:  Yeah, we won't object to him.

```
 1            MS. TERRY:  Of course not.

 2            THE COURT:  He's released.

 3            Well, let me just interject here, this is a

 4   process that involves people's lives.  He didn't know this

 5   when he was called that he was going to have orthopedic

 6   surgery, and he does have -- the most important single

 7   appointment that he has before his surgery is his preop, and

 8   that is clearly going to be something that conflicts with the

 9   trial.

10            I know you all want to win this, but this is not

11   just about winning.  It's about being fair to people.  And

12   the fair thing for him is to let him go considering this

13   change in circumstances that he didn't know of.

14            And I would hope that as we go through this

15   trial, that that is as important as you just wanting to

16   prevail.  And that's the tone that I want to set.  I will

17   say I'm surprised that anybody objected to him being

18   released.

19            Next is Juror No. 8.

20            There is a statement in response to Paragraph 10

21   about her responsibilities to babysit for her grandson while

22   her daughter teaches school, which has just started.  He has

23   health issues and was born three months premature, and they

24   have recommended that he not go to day care.

25            Now, I would say that this woman has not asked to
```

1    be excused, but I saw this and thought that this was a

2    responsible position taken by a juror.  And I would say that

3    if she had sent in to us an excuse saying I have got these

4    responsibilities, it's not my child -- and we allow people

5    that have children of young age, we almost per se allow them

6    to be excused and call them later.  But I think she

7    understood that's what the rule is and has not asked for

8    that.

9         But it seem that we ought to think about whether

10   she ought to be excused in light of these obligations to her

11   grandchild.

12        Responses?

13        MR. GODFREY:  Defendants do not object.

14        MR. PANKEY:  We would not object either.  I think

15   she would be a favorable witness for us based on her

16   responses, but I understand the Court's guideline, and she is

17   dealing with a premature grandchild.

18        THE COURT:  So she will be excused.

19        The next is Juror 15.

20        I sometimes when I see problems with responses,

21   somebody who might obviously not be able to be fair, to bring

22   that up to the parties to see whether or not they should be

23   excused, and Juror 15 struck me as one of those.

24        Specifically, his comment that he has, in response

25   to Paragraph 56, been discriminated against because of his

1    race.

2              MR. PANKEY:  He also has a job interview.

3              THE COURT:  In New Orleans.

4              Sometimes people answer questions because they want

5    to be excused, but I will say that he didn't take much care

6    in responding to these in my view.

7              And he claims he does have a job interview.  We

8    could check that to make sure that's true.  He is Juror 15,

9    so he's probably going to be within the group of people from

10   whom you exert peremptory challenges.

11             But I thought before I made a decision on him, that

12   I would get your input.  And I don't feel as strongly about

13   him as I did some of the others who had I thought legitimate

14   excuses.

15             Any thoughts?

16             MS. TERRY:  We have no objection, Your Honor.

17             MR. PANKEY:  No objection.

18             THE COURT:  All right.  So we will excuse him.

19             And the last is Juror 33, who tells us that they

20   have a vacation that if rescheduled would have financial

21   penalties associated with it.

22             I don't know if we will go through the 27th, but if

23   we did, I would hate to have to tell her that she's got at

24   the last moment to reschedule.

25             MR. COFFMAN:  She's leaving the week after the

1    trial.

2              MS. TERRY:  Yes, the week after the trial.

3              MR. COFFMAN:  Well, but you never know.  Yeah, we

4    could.  Once she's on, she is on.

5              THE COURT:  Well, you know, frankly she's probably

6    not going to be in the mix anyway.  Why don't we have her

7    come, and I think she's probably going to get the relief she

8    wants anyway.

9              I had forgotten, that's right, the 27th is the week

10   after.

11             Okay.  So we will keep her in the mix.

12             So the next thing I would like to do is get from

13   you who you would like to follow up on.

14             I will remind you the whole purpose of the

15   questionnaire and the reason why we posed it and I spent the

16   time I did in commenting on it is that *voir dire* in a civil

17   case allows you to ask certain questions, but it doesn't

18   become a free-wheeling conversation between the panel members

19   and the lawyers, which is why I wanted to get all your input,

20   and I was willing to send out a questionnaire that had almost

21   seventy questions.

22             So there might be something in this where if what

23   you say is you want to follow up with somebody because you

24   have a curiosity about something, I'm probably not going to

25   allow that.

1       But if there are some things -- and there are some

2  things I think that I require follow-up, and I have

3  identified those myself, and I thought I would let you take

4  the first crack at it.

5       And maybe we ought to begin with the plaintiffs.

6       MR. PANKEY:  As to the Juror No. 1, there is an

7  abbreviation, SOFO.  What is that, what does that mean?

8  I think it refers to the work.

9       THE COURT:  Yeah.  Some of these, I think what I

10  will do is I will have them -- we will just give them their

11  questionnaires back and ask them to explain that so we don't

12  have to bring them down.

13       MR. PANKEY:  Supervisor at SOFO for four years?

14       THE COURT:  We can follow up on that.

15       MR. PANKEY:  No. 1 also said they were involved in

16  a civil case.

17       I'm not sure what the Court's guidance is, what we

18  can ask about that?

19       THE COURT:  Hold on for a second, Mr. Pankey.

20       Do you have this?  Can you look in my briefcase to

21  see if it somehow slipped out.  It would be in the big

22  briefcase.

23       What's the question about civil cases?

24       MR. PANKEY:  No. 31:  Have you ever served as a

25  trial juror?  The answer was yes, civil, and they reached a

1    verdict.

2              THE COURT:  Well, we don't ever ask them what the

3    civil case was.  The only question we wanted to have

4    considered is if it was a criminal case, what kind of case

5    was it.

6              MR. PANKEY:  So my question would have been, if

7    it's allowed, what kind of civil case was it that you

8    participated in.

9              THE COURT:  Well, there are a number of people

10   that because we didn't ask them that didn't provide that

11   information.  Do you want to call all of those people down?

12   And if that was of interest of you, why didn't we just

13   include that?

14             MR. PANKEY:  I missed it, Your Honor, that's why.

15             THE COURT:  Well, I'm not going to let you follow

16   up on that, but you can follow up on SOFO.

17             How about the next -- all right.  Who is next?

18             MR. PANKEY:  Juror No. 3, who said she believed

19   she had been discriminated against and she did not

20   complain.

21             I was going to ask what was going on with the

22   discrimination.  It was Question No. 55 of the --

23             THE COURT:  Well, that's all we asked the juror to

24   tell us.  You want to say why didn't you complain?

25             MR. PANKEY:  What was the type of discrimination

1   that happened to her, what did she endure that she did not

2   complain about?

3              THE COURT:  But I gave you every opportunity to ask

4   those sorts of questions in the questionnaire.

5              MR. PANKEY:  Okay.

6              THE COURT:  I will say on No. 3 that I would like

7   to follow up with her myself on Question 60 to see whether or

8   not she can be fair and objective.  Is there any objection to

9   doing that?

10              MR. PANKEY:  None by the plaintiff.

11              MS. BAINES:  No objection.

12              THE COURT:  All right.  Who is next?

13              No. 4, by the way -- I'm sorry, any problem with

14   4?

15              In fact, let's do this this way, and this way we

16   won't have to go back and forth.  How about No. 4?  Does

17   anybody want to follow up with No. 4?

18              MS. TERRY:  No.

19              MR. PANKEY:  On Question 41, there is an acronym,

20   I thought it was GMO, but I now think it might be WMD,

21   weapons of mass destruction.  I wanted to get an answer as to

22   what that is.

23              THE COURT:  I'm sorry, for Juror No. 4?

24              MR. PANKEY:  Juror No. 4, Question 41.

25              THE COURT:  41:  I sometimes attempt to dispel

1    misunderstanding about WMDs and other biology that I am

2    familiar with.

3              I think it's WMD.

4              MR. PANKEY:  I wanted to know what that is --

5              THE COURT:  We will ask that person to tell us --

6              MR. PANKEY:  -- in the context of this person,

7    whether they are a biology type person and they know

8    something of weapons of mass destruction.

9              THE COURT:  Well, it's unclear to me, so we will

10   find out what that panel member meant.  All right.

11             MR. PANKEY:  He also said -- I suppose I can

12   look it up, I have not looked it up -- 38, what GUST means,

13   GUST, Gwinnett Understanding Secular Truths.  I would follow

14   up to see what that organization is, what they do or who they

15   are.

16             I might be able to find it on the internet.

17             THE COURT:  We will ask him -- why don't you look

18   it up on the internet.  I'm pretty sure I know what it is,

19   but if you are not satisfied, call us and we will see if we

20   can ask him to give us a couple-of-sentences description of

21   what it is.

22             All right.  Juror No. 5, looks to me like they

23   forgot to complete a page, so we will ask that page to be

24   completed.

25             Anything else on 5?

1           MR. PANKEY:  Not on 5.

2           Are we at 4?

3           MR. COFFMAN:  We did 4.

4           THE COURT:  6?

5           MS. BAINES:  We wanted to follow up on No. 46.  He

6    didn't actually answer the question.

7           MR. COFFMAN:  This is Juror No. 5?

8           MS. BAINES:  Juror No. 6.

9           MR. GODFREY:  6.

10          THE COURT:  Okay.  We will ask them to provide

11   that.

12          I think what we may do is rather than calling

13   these people down one at a time to ask this, we will have

14   somebody -- when they assemble, we will just ask them to

15   complete it.  And we will probably highlight the question and

16   we will ask them to elaborate on it or complete it.

17          MR. PANKEY:  Still with No. 6?

18          THE COURT:  Yeah.

19          MR. PANKEY:  Television shows, I can't understand

20   that response.  Is it LMN?

21          MS. TERRY:  Yes.  That's Lifetime Movie Network.

22          MR. GODFREY:  Lifetime Movie Network.

23          MR. PANKEY:  I would ask what that is, if that's

24   what it is.

25          MS. TERRY:  It is.  I watch that all the time.

```
1                    MR. PANKEY:  Is that just Lifetime?

2                    MS. TERRY:  There are two of them.

3                    THE COURT:  Apparently you are the only person here

4    who doesn't know the answer to that.

5                    All right.  No. 9, any follow-up for 9?

6                    If you tell me there isn't, I will know to move

7    on.

8                    MS. BAINES:  There isn't from us, Your Honor.

9                    THE COURT:  Plaintiffs, anything?

10                   MR. PANKEY:  Nothing.

11                   THE COURT:  All right.  10?

12                   MS. BAINES:  None for us, Your Honor.

13                   MR. PANKEY:  Nothing on 10.

14                   THE COURT:  All right.  11?

15                   MS. TERRY:  Nothing on 11.

16                   MR. PANKEY:  Nothing on 11.

17                   THE COURT:  12?

18                   MS. TERRY:  Nothing on 12.

19                   MR. PANKEY:  No. 12 said AICPA.  I didn't know what

20   that meant.

21                   THE COURT:  I think it's American Institute for

22   Certified Public Accountants.

23                   MR. PANKEY:  Okay.

24                   THE COURT:  But let's see if he's an accountant.

25                   He is the director of controlling, finance and IT.
```

1    I mean, I'm pretty sure that's what that is.

2              MR. PANKEY:  At Question 51, he answered yes on

3    diversity training.  I would like to follow up if he has any

4    understanding what diversity training is or whether it's

5    required or anything like that.

6              THE COURT:  You mean is diversity training

7    required?

8              MR. PANKEY:  Is diversity training required in

9    the hiring process or something like that, what is the

10   training they received, what is their understanding of their

11   training.

12             THE COURT:  Well, again, I gave you lots of input

13   on asking questions like that.  That was not chosen, so I

14   will not allow you to follow up on that.

15             If that's the case, you would do that for

16   everybody.  The purpose of this was to get from everybody

17   the information that you wanted.

18             So all this says is that he took -- it doesn't even

19   indicate that he took it.

20             Next?

21             MR. PANKEY:  I'm sorry, it indicated -- it doesn't

22   indicate whether they took it, No. 51?

23             THE COURT:  It says, Have you, any members of your

24   immediate family or close friends attended seminars?  It

25   doesn't ask whether that person -- to identify which one the

1        person filling it out did.

2                MR. PANKEY:  So can we get clarification as to who

3        received the training?

4                THE COURT:  Why didn't you ask for that?

5                MR. PANKEY:  Why didn't I ask for that?

6                THE COURT:  Yeah.  Mr. Pankey, the whole purpose of

7        this was to be abundantly fair to everybody and to give

8        everybody their say on what they wanted to ask and what was

9        important to them, and there is very little I would not have

10       allowed on the questionnaire.

11               And like I said, the questionnaire is pretty

12       long.  I think may be the longest we have done.

13               So next?

14               MR. PANKEY:  13, nothing by the plaintiff.

15               MS. BAINES:  Nothing by the defendants.

16               THE COURT:  All right.  14?

17               MS. TERRY:  Nothing by the defendants.

18               MR. PANKEY:  Nothing by plaintiff.

19               THE COURT:  We have dealt with 15.

20               So the next is 16.

21               MS. BAINES:  Nothing by the defendants.

22               MR. PANKEY:  They have a license plate.

23               THE COURT:  Yeah, I have that marked.  SEFROU?

24               MR. PANKEY:  It means something to them.  What does

25       that mean?

```
 1            THE COURT:  We will ask them about that.
 2            All right.  Next, 17?
 3            MR. PANKEY:  Nothing by plaintiff.
 4            MS. TERRY:  We had a concern on 17, Question
 5   No. 53.  She said that she did not complete a probationary
 6   period for a state position.  We were curious about why the
 7   probationary period was not completed.
 8            THE COURT:  I think that is -- because the question
 9   was have you ever been fired, laid off or quit a job.  She
10   provides us information that doesn't let you know whether she
11   was fired, laid off or quit, so I will allow you to follow up
12   on that.
13            MS. TERRY:  Thank you, Your Honor.
14            THE COURT:  All right.  Next?
15            MS. BAINES:  Nothing on 18 for us.
16            THE COURT:  I have got two -- personally two
17   substantial questions about her -- about not knowing what she
18   means in response to Question 60 or 61.
19            MR. PANKEY:  We are on 18?
20            THE COURT:  Yes.
21            MR. PANKEY:  Oliver Lee Robinson?
22            THE COURT:  Yes.
23            So I think this person needs to be followed up on
24   those two questions, and I will probably do that myself.
25            Anything else on 18 to follow up on?
```

```
 1            MR. PANKEY:  We have the same concern at 60,
 2     that this juror it's saying there should be balance in the
 3     hiring process, which is exactly what the plaintiffs
 4     contend went wrong in this case.  So I guess we would like to
 5     follow up on that.  It's an understanding of the law it
 6     sounds like.
 7            THE COURT:  Well, we are not asking them to tell
 8     us what the law is.  We are just asking them their
 9     positions.
10            And they will all pledge to follow the law, even
11     if it's inconsistent with their personal beliefs.  I ask
12     them that.
13            But I have already said that I'm going to
14     follow up with that to see what exactly they really mean
15     by that.
16            MR. COFFMAN:  Would we be allowed to follow up as
17     well?
18            THE COURT:  It depends on what the answers are.
19            All right.  19?
20            MS. BAINES:  Nothing for the defendants.
21            THE COURT:  19?  Going once?
22            MR. COFFMAN:  We may have some questions.
23            MR. PANKEY:  Yeah, I guess follow-up, she says yes
24     on 60 on asserting a claim for race discrimination:  I would
25     have to make a judgment on an individual basis.  My
```

1  question --

2        THE COURT:  I actually thought that was a pretty

3  reasonable answer.

4        MR. PANKEY:  You know, if it is what I think it is,

5  I agree, but how she wrote it I guess is my concern.  I want

6  to make sure I understand what her meaning is.

7        THE COURT:  Well, she answers the question,

8  she says yes, and then she offers her opinion, the opinion

9  that she would have to make a judgment on an individual

10  basis.

11        I think that's what you guys do.  I mean, somebody

12  comes in, you might say, well, you have a claim, but I don't

13  think you ought to assert it because it's not strong or it's

14  too expensive, or she might say I liked the person who did it

15  and I don't want to hurt them.

16        MR. PANKEY:  And then 66 -- there are a few people

17  like this -- she thinks there are too many lawsuits.

18        At 66:  Our society has become too prone to sue

19  and less likely to negotiate other ways to settle

20  disagreements.

21        THE COURT:  That's her opinion, which I think is

22  valid.

23        I mean, so what do you want to do?

24        MR. COFFMAN:  We would want to know whether that's

25  a bias against the plaintiffs or against the defendants.

1    I mean, who is at fault for not negotiating?  I mean, if she

2    demonstrates that she would hold that against us, we would be

3    more likely to strike her.

4              THE COURT:  You could have asked that question

5    too.

6              MR. COFFMAN:  You never know what people are going

7    to write when they answer.

8              THE COURT:  Well, I will follow up with her on

9    that, but I think that's -- this seems such a reasonable

10   response that it doesn't suggest that they are biased one way

11   the another.  It was an observation.

12             Which, by the way, there have been two articles

13   within the last week about the litigiousness of American

14   society with criticisms of both defendants and plaintiffs.

15   And sitting in this seat, I can tell you that both plaintiffs

16   and defendants are responsible for the litigiousness of our

17   society.

18             I will follow up shortly with her on that.

19             20?

20             MS. BAINES:  Nothing for the defendants.

21             MR. PANKEY:  Nothing on 20 by the plaintiff.

22             THE COURT:  I have -- I'm going to follow up

23   with Juror 20 on Question 60 because of the singling out

24   of especially in a professional working environment and

25   why -- whether or not -- whether or not she would consider,

1    since they don't know what the working environment here is,

2    whether there would be a different feeling about these

3    plaintiffs and their responsibilities in this department and

4    its responsibilities and whether or not that is

5    professional.

6              I think she is probably talking about white-collar

7    professionals, but I want to know the answer to that.  So I

8    will follow up with her on that.

9              21?

10             MS. TERRY:  21, Your Honor, defendants are

11   concerned with Question No. 41.

12             She stated that her spouse posts liberal political

13   opinions on Facebook and voiced some liberal political

14   opinions.  We wanted to follow up on sort of more information

15   about those opinions.

16             THE COURT:  Why?  It's not -- spouses aren't the

17   juror.

18             MS. TERRY:  Sometimes spouses have a lot of effect

19   on the other spouse, and although we tell them not to discuss

20   the case, they do.

21             THE COURT:  Well, and they pledge to me that

22   they won't, so I'm going to reject that you are positing

23   that a juror in this case would not follow my instructions.

24             So assuming that that's the case -- and I have

25   never had a case where jurors don't, at least that's been

1    reported to me.  And I have tried enough cases to believe

2    that is true, and you will see the instructions they get are

3    strong admonitions, and I give them a reason for it.

4           So let's assume they are going to follow the law

5    and they are not going to perjure themselves in their pledge,

6    what would knowing about somebody's liberal political

7    opinions that a spouse might post on Facebook, that, frankly,

8    it sounds to me like she doesn't like them or at least

9    doesn't like him doing that, but -- so why do you want to

10   know what a spouse believes?

11          MS. BAINES:  We will withdraw that.

12          THE COURT:  Thank you, I believe that's a good

13   decision.

14          Next, Juror 22?

15          MR. PANKEY:  Nothing by plaintiff.

16          MS. TERRY:  Nothing on --

17          THE COURT:  I do just want to make sure that this

18   person's husband is not studying employment law, to see

19   whether or not they might have some -- and that's her

20   response to Question No. 33.

21          MS. TERRY:  Your Honor, I had one more issue that

22   I want to address on 21, if you don't mind?

23          No. 65, 21 responded that they had -- she had to

24   report race information based on some acronym, AA.  I wanted

25   to follow up on what that was.

1                    THE COURT:  Affirmative action.

2                    MS. TERRY:  What was the reporting requirement, how

3        deep she was in it, how involved she got.

4                    THE COURT:  Well, she says that she was -- it asked

5        does she have to report it, she said yes, and then she

6        reported it and why she reported it, and that's 41 --

7                    MS. TERRY:  No, No. 65, Juror 21.

8                    THE COURT:  You know, I have to report that

9        information.

10                   MS. TERRY:  Okay.

11                   THE COURT:  I have to report the nationality and

12       ethnicity of the people that I interview.

13                   MS. TERRY:  It may be an issue in the trial at some

14       point, so I just wanted to follow up, Your Honor.

15                   THE COURT:  So what would you ask them?  I mean,

16       this at least tells you they are sensitive to it and are

17       required to report it in the past.

18                   MS. TERRY:  We will withdraw it.

19                   THE COURT:  All right.  22, we are going to follow

20       up on the husband's legal studies to make sure it doesn't

21       include employment law.  It probably doesn't, but I want to

22       make sure of that.

23                   Anything else on 22?

24                   MS. TERRY:  Nothing for defendant.

25                   MR. PANKEY:  Nothing by plaintiff.

1        THE COURT:  23?

2        MS. BAINES:  Nothing by the defense.

3        MR. PANKEY:  Nothing by plaintiff.

4        THE COURT:  24?

5        MS. TERRY:  Nothing from defense.

6        MR. PANKEY:  24 was passed over for promotion, says

7   discrimination is a staple of American life.

8        I'm sorry, are we on 24?

9        THE COURT:  Yes.  So --

10       MR. PANKEY:  52, was passed over for a promotion,

11   I would ask about that, and if they thought it was

12   discriminatory.

13       THE COURT:  Isn't there a question about whether or

14   not they have ever been discriminated against, which I guess

15   is Question 56?

16       MR. PANKEY:  56, he says:  Yes, discrimination is a

17   staple in the U.S. and occurs daily, either intentionally or

18   unintentionally.

19       THE COURT:  I think that's not really responsive to

20   the question about the discrimination, so I'm going to

21   allow -- I will follow up with the juror on that.

22       MR. PANKEY:  You will follow up with it; correct?

23       THE COURT:  Yes.

24       Actually I think you have got more clarification in

25   his response to 58, but we will ask him about that.

1          MR. PANKEY:  At 60, he wrote yes slash no, then he

2     says refer to 56 in talking about whether a person of any

3     race, including white people, can assert a claim for race

4     discrimination.

5          So it's a yes/no, maybe a white person cannot claim

6     race discrimination that I would be concerned about.

7          THE COURT:  Well, he does refer you back to 56.

8          MR. COFFMAN:  By yes/no, does he mean some people

9     could not be discriminated against and some could?  It's an

10    odd answer.

11         THE COURT:  I will follow up with him on that.

12    He's likely not to be in the pool anyway, but I will follow

13    up.

14         25?

15         MS. BAINES:  No for the defendants.

16         MR. PANKEY:  Nothing by plaintiff.

17         THE COURT:  26?

18         MS. BAINES:  Nothing by defendants.

19         MR. PANKEY:  Nothing by plaintiff.

20         THE COURT:  I'm going to follow up and find out

21    what his duties were at the EEOC.  I would just like to know

22    if he was an investigator or was making determinations as to

23    discrimination.

24         MR. PANKEY:  This is on 26?

25         THE COURT:  Yes.

```
1              MR. PANKEY:  I missed that.  I didn't see that.
2              THE COURT:  I'm just the judge in the case.  I'm
3    not getting paid anything.  It's my duty.  I thought that
4    I ought to read these carefully.
5              27?
6              MS. BAINES:  Nothing by the defendants.
7              MR. PANKEY:  No. 27 answered at 51 annual diversity
8    training at IBM.  I would follow up on what training did he
9    receive, what's your understanding of the training that you
10   received.
11             THE COURT:  Well, I am going to treat everybody
12   equally.
13             Again, I mean, when I read this question, I just
14   wanted to see -- I thought you wanted to see whether or not
15   people actually had the training, and that the details of
16   it -- I mean, I could tell you what the answer would be about
17   diversity training at IBM.  It's a big corporation, they are
18   required to do it.
19             When I was in the Air Force, I had to go through
20   it.  It was something that they wanted to let people know,
21   among other things, that you couldn't discriminate.
22             And if this person, who is 64 years old, he's
23   probably gone through lots of diversity training, it's
24   probably changed every time.
25             So I think to go and have him plow through all his
```

1   past training and the details of it, considering that there

2   wasn't a request for more particularity about the training, I

3   will not allow that.

4            28?

5            MS. TERRY:  Nothing from defendants.

6            MR. PANKEY:  None by plaintiff.  Proud to serve as

7   a juror.

8            THE COURT:  So would you like to call them and ask

9   them what is the basis of their pride, is it constitutional

10  versus personal?

11           MR. PANKEY:  No, sir.

12           THE COURT:  All right.  29?

13           MS. BAINES:  Nothing by the defendants.

14           MR. PANKEY:  Nothing by plaintiff.

15           THE COURT:  30?

16           MS. BAINES:  Nothing by the defendants.

17           MR. PANKEY:  Did I understand No. 30 to be a

18  convicted felon?

19           THE COURT:  We are looking into that.  If he was

20  convicted and somehow either was pardoned or was a first

21  offender, it could be that they are not prohibited from

22  serving.

23           But I have already got a call into the jury

24  office.  If he was convicted and there hasn't been any

25  effect on his conviction, I think he probably has to be

1  excluded.

2          We ask that of everybody when we send out the first

3  notification, and it could be that -- I think it was an old

4  conviction.  Twenty years ago, as I recall.  Yeah, and he got

5  a probated sentence.

6          It could be when he filled out that little card,

7  he just forgot about it, and when he got this, he remembered

8  it.

9          So we are checking it.  So we will let you know if

10  he ends up being excluded from the pool.

11          MR. PANKEY:  At 60 he said no comment, do you have

12  an opinion.  I would ask him for an explanation of this

13  question.

14          THE COURT:  I will let you -- I will follow up on

15  that if he stays in the pool.

16          MR. COFFMAN:  So he's been accused of

17  discrimination, we'd follow up on that.

18          67:  I don't think I would be fair.  It depends on

19  the defendant.

20          Somebody wouldn't like that juror, I assume.

21          THE COURT:  We will follow up on that.  I actually

22  think he's not going to be in the pool, but I haven't been

23  able to get a clear answer to that yet.

24          Let me just tab all the places I need to follow up

25  with him on.

1          MR. PANKEY:  Your Honor, we are going to start

2    picking the jury from the beginning, No. 1, from the pool?

3          THE COURT:  Each of you are entitled to three

4    peremptory challenges, we have six jurors and two

5    alternates, which means we have to have eight plus six,

6    that's fourteen.  So it would be the lowest fourteen

7    numbers.

8          MR. PANKEY:  The likelihood of getting to him is

9    remote I would think.

10          THE COURT:  Probably, yeah.

11          31?

12          MS. BAINES:  Nothing for the defendants.

13          THE COURT:  But sure enough if we quit doing this

14    now, something will happen.

15          MR. COFFMAN:  That's the way it works.

16          THE COURT:  Anything for Juror 31 from the

17    plaintiffs?

18          MR. PANKEY:  I know what CNA is, but Juror 31

19    says something about CNA -- I couldn't read -- private duty

20    case?

21          THE COURT:  I'm sorry, what number are you looking

22    at?

23          MR. PANKEY:  Juror No. 31.

24          THE COURT:  Right.  What question number?

25          MR. PANKEY:  No. 11, current employer, Olin Lathem,

1    Newnan, CNA, private duty case, is that what that says?  CNA,

2    private duty case, is that what that says?

3                  MR. GODFREY:  I believe that's private duty nurse.

4                  MR. PANKEY:  Nurse.  That's my question.

5                  MR. COFFMAN:  I don't know.

6                  MR. PANKEY:  Is it the insurance company?  There

7    is a CNA Insurance Company.

8                  MS. TERRY:  Yes.  They do nursing from house to

9    house.  They send out nurses.

10                 MR. PANKEY:  CNA is also an insurance adjusting

11   company.

12                 MS. TERRY:  Sometimes they send out nurses to do

13   nursing exams.

14                 MR. GODFREY:  She used to be in insure.

15                 MS. TERRY:  I spent years in insurance.

16                 MR. PANKEY:  So CNA, private duty nurse, what does

17   this mean?

18                 MS. TERRY:  She probably goes out and does

19   insurance exams for like when you get life insurance or job

20   insurance, any type of things like that, I imagine she would

21   be doing it.

22                 But I guess the Court could --

23                 THE COURT:  Well, we can ask her to clarify that.

24                 I mean, she doesn't even have a high school degree,

25   so I wonder if they would be having her out there

1   interviewing people in their homes.

2           MS. TERRY:  Yes, they would.  I have had one --

3           THE COURT:  That's why she is doing that --

4           MS. TERRY:  Exactly.

5           THE COURT:  We will ask her about that, fair

6   enough.

7           32?

8           MS. TERRY:  None.

9           MS. BAINES:  Nothing for the defendants.

10          MR. PANKEY:  Nothing by plaintiff.

11          THE COURT:  33?

12          MS. BAINES:  Nothing for the defendants.

13          THE COURT:  34?

14          Oh, I'm sorry, plaintiffs, Juror 33?  I just

15  thought she's the one going on vacation.  I was too quick to

16  skip over her.

17          MR. PANKEY:  Your Honor, we are on 33; correct?

18          THE COURT:  Yes.

19          MR. PANKEY:  At 60 they wrote no, and then crossed

20  it out and put in:  Yes, everyone is entitled, but I think

21  assertion may not always be valid.

22          My question is what is she referring to, what type

23  of claim, or is she referring to somebody?  What does this

24  mean?

25          THE COURT:  I think what she's saying is what

1    I tell people:  Anybody can file a claim.  It doesn't mean

2    that it's a valid claim.

3            But I think she misread the question, which is why

4    she changed it, because her answer, her opinion, seems to be

5    responsive.

6            MR. PANKEY:  And this is the one on vacation?

7            THE COURT:  Yeah, I will think about -- if we need

8    to, I will think about following up on that.

9            34?

10           MS. BAINES:  Nothing by the defendants.

11           MR. PANKEY:  Nothing by plaintiff.

12           THE COURT:  35?

13           MS. BAINES:  Nothing by defendants.

14           MR. PANKEY:  On 35, the physician assistant in

15   anesthesia, has been sued for malpractice and had a

16   verdict against him, and I am assuming disagrees with

17   arbitrary awards at 66:  Filing for discrimination for

18   personal gain, most awards seem within the realm of

19   reason but occasionally there are those that seem

20   excessive.

21           I would like to follow up what he is referring

22   to by excessive or his past experience and the verdict

23   against him.

24           It looks like and he's upset with being sued.

25           THE COURT:  Well, wouldn't you?  I mean, really.

```
 1              MR. PANKEY:  Absolutely.

 2              THE COURT:  It was personal injury litigation,

 3    not a discrimination case.  So what do you want to know?

 4              Did you like being sued?  They are going to tell

 5    you no.

 6              Did they think they shouldn't have been held

 7    liable?  They are going to say, yeah, I think they shouldn't

 8    have been held liable.

 9              And then much later they say, yeah, I think there

10    are some jury awards that are excessive.

11              MR. PANKEY:  What is an excessive award for you?  A

12    million dollars, is that excessive?

13              THE COURT:  Do you really think that's what they

14    are talking about?

15              MR. PANKEY:  I think --

16              THE COURT:  It says occasionally, in the millions

17    of jury awards, occasionally some are excessive.  I think

18    that's a fair answer.

19              I don't want to embarrass this witness by quizzing

20    them on what they mean by excessive when I think it's plain

21    from the answer.

22              36?

23              MS. BAINES:  Nothing by the defendants.

24              MR. PANKEY:  Nothing by plaintiff.

25              THE COURT:  37?
```

1          MS. BAINES:  Nothing by the defendants.

2          THE COURT:  This is another spouse lawyer, so I

3    will ask to see what practice they are in.  That's his answer

4    to 18.

5          Anything else on 37?

6          MR. PANKEY:  At 11, Please state name and city of

7    your current employer and describe your current job:

8    Wells Fargo, Atlanta, regional HR leader, lead team of HR

9    Business Partners across Southeast Region, accountable for

10   Employee Engagement/Retention, possibly Diversity and

11   Inclusion.

12         My question is what does that mean, what is she

13   doing in her job, Employee Engagement, if that is Retention,

14   I can't read it, Diversity and Inclusion.

15         THE COURT:  We will ask her to provide a little

16   more information about what her job actually entails since

17   she was asked to describe it.  I'm not sure she did anything

18   other than provide titles.  So I will do that.

19         Anything else on 37?

20         MR. PANKEY:  Nothing by plaintiff.

21         THE COURT:  38?

22         MS. BAINES:  Nothing by defendants.

23         MR. PANKEY:  He said his dad was fire chief.

24   I guess I would ask fire chief where.

25         THE COURT:  What question is that?

1          MR. PANKEY:  Fire chief -- 28 (b):  Have you or

2    your immediate family worked for local government?  Sister

3    and dad as a fire chief, dad retired in '97.

4          THE COURT:  All right.  I will ask him what

5    jurisdiction he was a fire chief.

6          Juror 39?

7          I would follow up on Question 60 which I don't

8    understand.

9          MR. PANKEY:  60 was our issue.

10         MS. TERRY:  That was our issue as well.

11         THE COURT:  Anything else for 39?

12         MS. BAINES:  That was it for the defendants.

13         MR. PANKEY:  Nothing else for the plaintiff.

14         THE COURT:  40?

15         MS. BAINES:  Nothing for the defendants.

16         MR. PANKEY:  Nothing for plaintiff.

17         THE COURT:  41?

18         MS. TERRY:  Nothing for defendants.

19         MR. PANKEY:  Nothing for plaintiff.

20         THE COURT:  42?

21         MS. TERRY:  Nothing for defendants.

22         MR. PANKEY:  Nothing by plaintiff.

23         THE COURT:  43?

24         MS. BAINES:  Nothing for the defendants.

25         MR. PANKEY:  I'm sorry, are we on forty --

```
 1              THE COURT:   -- three.
 2              MR. PANKEY:  Nothing by plaintiff.
 3              THE COURT:  44?
 4              MS. TERRY:  Nothing by defendants.
 5              MR. PANKEY:  She's a court reporter, I believe.
 6    I would follow up, has she ever worked with anybody here as a
 7    court reporter.
 8              MR. COFFMAN:  Has she ever worked for any parties
 9    in the case, any lawyers.
10              MS. TERRY:  Yes.
11              MR. PANKEY:  Yes.
12              THE COURT:  Well, we will of course know that from
13    the qualifying questions, so you will get that.  I ask if
14    they know you.  And then you will be humbled because here
15    is a court reporter who will say they have no idea who you
16    are.
17              MR. PANKEY:  You don't remember me?
18              THE COURT:  Well, that would be the answer even if
19    you did work with them, would they remember.  But we will ask
20    her to answer that question.
21              All right.  So that's all of the questionnaires.
22              And I think my plan is that we will call probably
23    the first twenty down to follow up, however many follow-ups
24    are in this pile, and then we will see if there are any
25    for-cause challenges.
```

1            And if from that twenty we have enough to do

2    peremptory challenges, we won't follow up with anybody else

3    because we wouldn't need to do that.

4            Does that suit everybody?

5            MS. TERRY:  Yes, Your Honor.

6            MS. BAINES:  Yes, Your Honor.

7            MR. PANKEY:  Yes, Your Honor.

8            MR. COFFMAN:  Of course, we would like to follow up

9    with everybody with anything, but we think that's off the

10   table.

11           THE COURT:  Well, this is purely a mechanical

12   thing.  Why follow up with people in a private setting that

13   are not going to be within the pool of people against whom

14   you would assert peremptory challenges?

15           MR. COFFMAN:  I agree with that, absolutely.

16           THE COURT:  That's all I'm saying.  We will bring

17   twenty down, follow up with them.  But there is no reason to

18   do 21 to 44 if we have enough to do peremptory challenges and

19   find a jury.

20           MR. COFFMAN:  Okay.

21           THE COURT:  So that's how we will do that.

22           But before we do that, there are things I need to

23   address to them as a whole.  So on Monday morning what we

24   will do is after they have been convened upstairs, they will

25   be sent down usually at 9:30.

1            Is that right?

2            THE CLERK:  Yes.

3            THE COURT:  So we ask them to send them down at

4    9:30.  I will tell them a little bit about why they have been

5    called and what jury service is.

6            And then there are a number of things that I need

7    to do to see whether or not there are any legal

8    disqualifications.  And I do that through a series of

9    qualifying questions.

10           Because I want you to know exactly what I am going

11   to ask, I typed those up for you.  You can rely on these

12   being the questions that I ask.

13           I would specifically ask you to look over the

14   witnesses against whom they have to be qualified.

15   I think we have everybody based upon what you submitted

16   to us.

17           But if there have been any changes, I will need to

18   know that.  Because specifically if there is somebody that we

19   have overlooked as a witness or overlooked as a party, they

20   have got to be on the list, because that is a legal

21   qualification issue.

22           Then I will read them a summary of the case.  The

23   summary -- as you know, we ask you -- I'm frankly not sure

24   why we ask you to do this, but we do -- to provide your

25   summary of the case, which is almost always lots and lots of

```
 1      pages long.
 2              And I guess that's good for somebody who doesn't
 3      know anything about the case, but, you know, I have done some
 4      stuff on this already, so I had an idea of what the case was
 5      about.
 6              The purpose of this summary that I am going
 7      to read to them is to give them enough detail to see if
 8      they know anything about the case.  And I have drafted this,
 9      and this is what I intend to describe for them as to the
10      case.
11              I want you to look at it, but when you look at it
12      don't say, well, there has got to be a lot more detail about
13      what we contend, and the other side is going to say, well,
14      no, then there has got to be a lot more detail about what
15      I contend or my client detends.
16              That's not the purpose of this.  The purpose is to
17      give them a snapshot because if somebody said I know
18      something about that, either I heard about it or I was at a
19      party once where they discussed it and we had a long
20      discussion about whether or not it was a good thing or a bad
21      thing.
22              So don't look at this as a detailed, thorough
23      description of the case.  The purpose is to give them
24      enough information that they can say I really do know
25      something about that.  And that has happened one or two
```

1       times in the past.

2               Now, on the qualifying questions and on the

3       summary, if you would like to provide me input, either

4       I have misstated something or there is something that has

5       to be added to these, the easiest thing for you to do is to

6       make interlineation edits.

7               So if you think I need to add something or strike

8       something, I'm happy to have you do it in pen and ink and PDF

9       it, scan it in, and fax it to us.

10              I don't want to burden you to have to write a brief

11      or send a letter.  If you make an edit and I look at it --

12      and I'm pretty sure I am going to know why you did that and I

13      will be able to evaluate it.  And if I have questions, we

14      will send you an e-mail saying why do you want that or, by

15      the way, there is something else I think we ought to add, we

16      can do that.

17              But I don't want this to be a burden to you, but

18      I do want to give you a chance to have input.  The only thing

19      is that if you send something in handwriting, it ought to be

20      legible, which is not always what we get, so just be

21      careful.

22              I do -- you will see on the qualifying questions

23      there are a couple of questions which I will ask after

24      I read the summary.  So those are there for you as well.

25              After I do this, I will have them adjourn.

1    I think what I will do is I will tell those that have

2    numbers that fall within the range of 1 through 20, that

3    they ought to hang out in the vestibule because we will call

4    them in, we have some follow-up.

5         Everybody else I will tell to go up to the jury

6    assembly area because it is more comfortable, there are more

7    seats and there is some reading material.  Because I think we

8    won't have to follow up with them.

9         I do admonish them, even though they are not jurors

10   in the case, they know a little bit about the case, they

11   shouldn't talk about the case or this kind of case.  If they

12   have any conversation, it ought to be light and superficial,

13   but it should not be about the case or this type of case.  So

14   when they go up there, they know that even though they are

15   not jurors, that they still have limitations on what they can

16   say to each other.

17        After we are done with the follow-up questions,

18   which shouldn't take a long time -- probably forty-five

19   minutes, maybe an hour -- I will make a judgment whether to

20   take a break or whether I think that we have -- that we have

21   not been going for a long time.

22        But whatever we do, we will not do challenges

23   either for cause or peremptory in front of the jurors.  They

24   will be somewhere.  There is no reason for them to sit and

25   watch that process, which they don't know what it is anyway,

1    and they are uncomfortable on the benches and they are

2    crowded back there.

3                So the goal would be that we would bring them back

4    in after we do that and be able to tell them who the jurors

5    are in the case.   And that generally works out well.

6                After -- and -- thank you.

7                The way we do peremptory challenges is I just

8    think it's simpler to -- I came up with this idea of a

9    chart.   I will give you a copy of this in a second.   It's

10   just simple.

11               The first challenge, which will be made by the

12   plaintiff, you will just put the juror number over here, and

13   just make sure that we know that you are the plaintiff.   And

14   you will just hand it across the aisle to the opposing

15   counsel, and then they will put the juror number and the

16   defendant.

17               And then we will do all the strikes.   And I will

18   probably put a bold line to say don't go any further than

19   this, because by that time all of your challenges will have

20   been exerted.   It just seems to be more efficient and nobody

21   has to stand up and make an announcement.   So that's the

22   chart that we use.

23               You will see -- you won't know the context of this

24   until you get my order on the motions *in limine*.   But there

25   are two limiting instructions that I will give with respect

1    to the testimony of two witnesses.

2            I am going to go ahead and give you my proposed

3    limiting instructions so that you will be able to see that

4    after you read the order and you will get an idea of what the

5    limitation is that I am giving to them and how I will give

6    it.

7            You will see that there is bracketed materials

8    because it will depend upon the actual testimony that is

9    elicited.  And because I wasn't confident enough to be able

10   to rely upon the written submissions, I thought I ought to --

11   I am going to reserve the option of characterizing that after

12   I hear the actual testimony, which is why you will see the

13   bracketed information.

14           So if you have any, again, comments on that after

15   you read the order and you want to pass those along to me,

16   you can do the same thing, make pen-and-ink edits, or if

17   you want to send an e-mail on it, it might be easier to do

18   that on something like this.  Maybe not, but whatever you

19   think is the best way to communicate with me, I would

20   appreciate that.

21           MR. COFFMAN:  So you are going to read this after

22   the jury has been selected; right?

23           THE COURT:  No.  I'm going to do it after the

24   testimony.

25           MR. COFFMAN:  Oh, of each witness?

1          THE COURT:  Yes.  So that as soon as -- and I will

2    do it in the middle of the testimony.  As soon as the

3    testimony that is allowed is in, I will interrupt them so

4    that they know at that moment the limitations on their

5    consideration of that evidence.

6          And I will tell you, sometimes I need help, a

7    reminder on doing that just to make sure that I do it at the

8    right time.  I don't think I will miss it, because I spent

9    some time understanding what your evidentiary issues are, but

10   you never know what's going on and how dynamic the testimony

11   is.

12         So remind me if I need to be reminded, but you

13   probably won't have to do that.

14         So after we do -- we do the peremptory challenges,

15   we will bring them in, we will seat them, I will do the

16   preliminary instructions that I have for them, and then we

17   will begin.

18         Opening statements I always set in my standard

19   instructions at fifteen minutes with closings at thirty

20   aside.  I believe in the old saying attributed to Mark Twain

21   who once said I would have written something shorter but

22   I didn't have the time.

23         And, I mean, if you want more time than that, I

24   will think about it.

25         I will tell you that in the couple of occasions

1   when lawyers have said that they wanted much longer and

2   I said no, that after the trial they said that that really

3   helped them.

4           And the jurors will say that it helped them.  And

5   when I let them go too long, I start get eye-rollings, and

6   I'm sitting there saying, well, that's the third time we

7   heard that.  And you would be surprised that by the time --

8   especially by the time you get to closings, they will know

9   the case.

10          There will be a point in time in the case when

11  I look over at them and they have decided -- I mean, they get

12  a sense of what happened, and then what else comes in might

13  change their mind a little bit, but you are going to have a

14  very mature jury on this case.  You are going to have people

15  mainly in their 50s and 60s.  I have never seen a pool like

16  this.

17          Some of you are going to say that's good for me.

18  Some of you are going to say that's good for me.  I will

19  tell you this, just having done this for a long time, that

20  I think you will be surprised, the people that are in that

21  season, how incredibly fair they are, and that you will get a

22  fair result from them, and you will get one that might

23  surprise you.

24          This is -- when we have jurors that are this

25  vintage and I go back and talk to them, I am really surprised

1    how wise they are.  And they will see through all of the --

2    all of the things that they should see through.  They will

3    reach decisions that are right.

4           They will to a T follow the law that I give to

5    them, because they are rule-followers, because that's what

6    this generation in their 50s and 60s is like, and they

7    believe in the country and they believe in our processes, and

8    they will not violate their instructions.

9           So it's just been -- it's an interesting pool,

10   which is -- you know, I have had some pools where I don't get

11   anybody that's over 35 years old.  It's just the way the

12   random drawing works.

13          So we give them their instructions.  We go right

14   into openings.

15          Does anybody want more than fifteen minutes?

16          Frankly, I don't think it's that complicated a

17   case, but it depends upon how much people think they are

18   going to throw up charts and how much time it takes to do

19   that.

20          Or you could use the tool of death, which is a

21   Powerpoint.

22          MR. COFFMAN:  We don't need more than fifteen

23   minutes.

24          MR. GODFREY:  We don't either.

25          THE COURT:  I will pass along something.  There

1    is a -- Powerpoints are deadly.  Jurors hate Powerpoints.

2    I hate Powerpoints.  And the only time that I see lawyers get

3    in trouble is that they know Powerpoints are boring and they

4    will try to put something that's really sort of catchy in it,

5    and it will be a problem.

6            So there is only one software that allows you to

7    use a Powerpoint sort of thing that is interesting enough

8    that people don't look at it as a Powerpoint.  It's called

9    Prezi, P-r-e-z-i, if you've ever used that?  It takes a while

10   to learn how it works, but it's an interesting free

11   technology.

12           But even in a case like this, they would probably

13   say, well, that is a little too fancy for me.  So just my

14   current view on jurors and their reaction to those sort of

15   projections.

16           Trial, we do full trial days.  Your partner,

17   Lee Parks, will know that since he's tried a case here.  It

18   goes quicker than you expect.

19           But this is not a Court where when I say there is a

20   15-minute midmorning break, that you can say, well, it's

21   really going to be 45, because it is not.  It will be fifteen

22   minutes.  Lunch will be an hour.

23           We will start promptly after the first day at

24   9:00, with the exception of those days when I have got to

25   go and have some treatment.  We will stop pretty promptly

1    at 5:00, although maybe a little before or maybe a little

2    after, depending upon where it would be a good place to

3    break.

4            And so we get six hours of testimony in every day,

5    and it goes much quicker than people expect.

6            MR. COFFMAN:  Any set time for your midmorning

7    breaks?

8            THE COURT:  It depends where we are with

9    witnesses.  I try to really make it midmorning.  I try

10   to take lunch at 12:30.  And it just depends on where we

11   are.

12           Occasionally a juror will get fidgety and I will

13   get a little note saying they need to take a break now.  So

14   I would say if we start at 9:00, it is probably somewhere

15   around 10:30, 10:45.  And the afternoon one is probably 3:15,

16   3:30.

17           I will share this with you.  I talk to every jury

18   for at least an hour, often a couple of hours, because

19   sometimes, especially in criminal cases, they want a debrief

20   and they want to process the experience, not their

21   deliberations, but just their experience with each other and

22   their experience in serving and why it's different than they

23   expected.

24           The one thing that they have always said -- and

25   I tell them that we -- and I will say this to you because

1    I am going to say it to them -- that it is our

2    responsibility -- the only people getting paid in that

3    courtroom for what is being done is us, and often there will

4    be jurors there that are taking a financial -- making a

5    financial sacrifice to do this public service.

6            And I think that means that our job collectively is

7    that when they are there, they are doing their job, which is

8    listening to testimony.  And it doesn't mean that they are

9    back in the jury room while we are out arguing about some

10   evidentiary issue.

11           I will tell them -- and I will say that I have had

12   this discussion with you -- and that is that we understand

13   our responsibility to them and, therefore, I am available --

14   and the reason why we are going to start at 9:30 on the days

15   I have treatment is I want to make sure I have half an

16   hour -- because I'm pretty sure I can be back here by 9:00 --

17   that gives me a half an hour that we can meet.  I will stay

18   during any break, I will stay through lunch, I will stay

19   afterwards.

20           And that means we have had evidentiary hearings

21   afterwards on experts that have gone until 8:00 at night.

22   The jurors don't know that, but when they come back the next

23   morning at 9:00, they are hearing testimony again.  And

24   I think we have to make that commitment to them.

25           Because the one thing that they will say is they

1    thought they would come down here and their time would be

2    abused, and they will say that never happened.

3           And I think that's good for the system, I think

4    it's good for the reputation of the courts, it's good for

5    them personally, and, frankly, I think it's good for us so we

6    can have a fuller, freer discussion without the pressure of

7    having them -- of having us know that somebody is waiting for

8    us to move forward if we do it on our time.

9           It takes a little bit of a sacrifice, but generally

10   not very much, which is why in a perfect world -- and we have

11   had a couple perfect experiences -- that I don't have bench

12   conferences.

13          You guys have lived with this case forever.  You

14   know what the issues are.  If somebody -- if a witness is

15   testifying and you say I know where this is going, that you

16   ought to pick a time when they are not there to say I think

17   something is going to come up, I have talked to counsel, and

18   I am pretty sure that they think it's going to come up, we

19   would like to talk to you about it, because we think it

20   shouldn't come up, we think it should be excluded, and we can

21   deal with that.

22          But again it's going to take some professionalism

23   on our part to see going -- I can tell where that happens, I

24   could just feel heading in that direction, and so I might

25   find a time when we take a break to say it looks to me like

1    X, and we will talk about it and try to get it resolved so we

2    don't do that in the worst of all times, which is to have

3    somebody's testimony interrupted, send them back, they wonder

4    what's going on, and often when we do that, it just takes too

5    long.

6            So that's what I will tell them, and I look

7    forward to your cooperation in trying to keep that promise

8    to them.

9            So evidence is in.  Whatever motions you want to

10   make at the end of the plaintiff's case, at the end of the

11   defendant's case, I will deal with those when the jury is

12   taking their breaks.

13           We will do closings.  I will let you think -- if at

14   some point you think you might need a little more, a little

15   more than half an hour -- why you would want a little more

16   than half an hour I don't know -- but if you really feel like

17   you do, let me know and we will see if we might extend it a

18   little bit.  But it will depend on how the evidence comes in

19   and whether or not I think it's complicated or whether or not

20   you think it's complicated.

21           Then we will, after closing, charge the jury.

22           You know there are new 2013 pattern jury

23   instructions in the employment law area.  I actually

24   think they need linguistically a little tweaking just

25   because I think some of the wording is, not wrong, it's

1    just awkward.

2         And so I will probably take a look at those.  It

3    will be the first time I have used them, and don't be

4    surprised about that.

5         There has been since the last Supreme Court term

6    some changes that are about to be announced to the Pattern

7    Jury Instructions.  I have got to go back and see whether or

8    not those changes are going to affect any of the charges in

9    this case.

10        And I didn't do that because I wanted to see

11   what you all thought were the charges that should be given

12   first before I did some research which may end up not

13   being necessary.  But we will have time to talk about that,

14   and I will probably tell you that before the charge

15   conference.

16        I will decide when to do the charge conference.

17   Again, my practice has not been that if we get done say at

18   the end -- near the end of the day I will say, well, let's do

19   it tomorrow at five and then we will do arguments the

20   following day.  We will probably meet early the next day

21   after all the evidence is in, have the charge conference, and

22   go right into closings.  But that will depend upon when the

23   evidence is over.

24        I will look at your verdict forms.  It's almost

25   always not quite the form that I want that I'm familiar with

1   and I'm comfortable with.  But we will take the theories of

2   your form, and you will know what form I'm proposing at the

3   charge conference because we will redo it and I will give it

4   to you.

5          The danger for the plaintiffs is that you have

6   got to have enough people to testify on the first day.

7   If anything, everybody thinks it's going to go a little

8   slower.

9          And actually the government is the worst about this

10  in the criminal cases.  We will go to 4:00 and they will say

11  we didn't think we were going to get through five witnesses,

12  and I said, well, we did, so where is your sixth?  Well, they

13  are not here.

14         Just make sure you have enough.  Probably in this

15  case, looking at the length of people's testimony, we

16  probably won't have that problem, but be prepared to do

17  that.  By do that, I mean have enough evidence to put in to

18  make it a full first day.

19         I think those are the -- all the nuts and bolts

20  I needed to cover.  That gives you a feel for how the trial

21  is conducted and the processes.

22         So I guess if you have any questions, I will turn

23  it over to you.

24         MR. COFFMAN:  I have a question.

25         You may recall back in February the parties

1   submitted a joint sort of trial structure document, and in

2   that document I think we both suggested that there would be a

3   liability determination and then damages would be presented

4   after that.

5         So my question would be is that the way the Court

6   desires to proceed in this case?  And, if it is, will we do

7   sort of a mini closing after liability and then have a

8   damages sort of presentation as well?

9         THE COURT:  I mean, having seen now what the length

10   of the testimony is and thinking that I might be open to that

11   if there is the possibility of saving a lot of time, I just

12   don't think this trial is that long now, and I just don't

13   like the idea of bifurcating.  I think everybody ought to

14   know the whole story.

15         So I'm inclined not to do that.  But I am open to

16   discussion on that.

17         MR. COFFMAN:  I mean, that suits us fine.

18   Otherwise, we would have people testifying twice at least

19   from our perspective.

20         THE COURT:  Not many.

21         MR. COFFMAN:  Not many, but if we could avoid that,

22   it would be ideal.

23         MR. GODFREY:  I guess my concern is if all the

24   plaintiffs are going to testify, is their testimony going to

25   be limited in scope as to more so damages than to discussions

1    of their qualifications and the things we are not supposed to

2    be talking about.

3              THE COURT:  Yeah.  Well, that's a good point.  But

4    from what I could tell, at least what I assumed -- and maybe

5    I'm wrong -- is that their testimony each would be short and

6    would be related to damages.

7              MR. COFFMAN:  Yeah.  We don't intend -- we filed

8    the motion to keep qualifications out, so I wouldn't intend

9    to go in and open that door.  It would not be my expectation

10   to do that.

11             THE COURT:  I think -- here is what I would

12   suggest before I make a final decision on that.  I think

13   you ought to take two witnesses and you ought to do an

14   outline of what you intend to ask them, and share that with

15   the city so that they have a sense of what specifically is

16   going to be covered and so that there is a common

17   understanding --

18                   (A cell phone sounds.)

19             MS. BAINES:  Sorry, I hit the wrong button.

20             THE COURT:  I was thinking, you know, some

21   judges would take that.  But I'm just assuming that was a

22   mistake.

23             MS. BAINES:  Yes, sir.  I'm sorry.

24             THE COURT:  And besides, I don't have any use for

25   an orange-colored cell phone.

```
1              So I think that would be a way -- that should
2    address your issue.
3              MR. GODFREY:  It should.
4              THE COURT:  And I agree, I think it should be
5    limited, it shouldn't take very long.
6              And I will tell you this.  After about the fourth
7    person, the jurors are going to say I get that.  Why -- how
8    many more of these do we have?
9              Because they are going to understand the nature
10   of the testimony, what it is, they are going to appreciate
11   that it has to come in, but some group of those jurors are
12   going to say, well, after we got an idea of what it --
13   of the nature of the testimony, couldn't they have just
14   agreed to that, because it doesn't seem like anybody
15   contested it.
16             So I would urge you to think about that.
17             MR. COFFMAN:  We would be happy to do that.
18             My other question is about --
19             THE COURT:  You said you had a question.
20             MR. COFFMAN:  Did I say a?  I had a couple.
21             THE COURT:  You had one at a time is what you were
22   saying.
23             MR. COFFMAN:  Right, exactly.
24             Equitable remedies.  My assumption going in is that
25   we would address equitable remedies posttrial.  If we were to
```

```
1    prevail, then we would have perhaps pension losses, if there

2    are any, and things of that nature.

3              MR. GODFREY:  I am agreeable to that.

4              THE COURT:  That's what I thought we were going to

5    do.

6              MR. GODFREY:  Yeah.

7              THE COURT:  We shouldn't hold them up.  Because I

8    have this penchant to do things in writing, I wouldn't want

9    to have the burden of waiting to release them while I did

10   that part.

11             So that would be my thought is -- although you also

12   out to have a discussion and agree as to what the equitable

13   remedies that I would have to decide are so that we don't get

14   at some point and say, well, if I had known they were going

15   to ask for that, I don't think that's an equitable remedy,

16   I think that's a legal remedy.  And I think there ought to be

17   agreement on what it is that I will decide as an equitable

18   remedy.

19             MR. COFFMAN:  We will do that.

20             THE COURT:  And what I would like to do is on these

21   questions for the -- the questions that you will ask of each

22   of the plaintiffs, I would like for you to share those no

23   later than the end of the day on Wednesday, and by the end of

24   day on Wednesday I would like your list of equitable remedies

25   that you each agree would be limitedly addressed to me after
```

1    trial.

2            MR. COFFMAN:   Okay.

3            THE COURT:   That way it gives me a couple days if

4    there is some disagreement on that that I have got the

5    capacity to fit a hearing in if we have to have that, or

6    conference, or a pleasant discussion among professionals,

7    however you want -- assuming there is a disagreement, because

8    hopefully there won't be any.

9            MR. GODFREY:   I only have one issue, and that

10   is in light of your ruling on their expert, does that

11   have any impact on our ability to call our expert in the

12   case?

13           THE COURT:   On what issue?

14           MR. GODFREY:   Well, as I understand their case

15   at this point -- and it's been kind of a moving target --

16   they are going to present a case with some anecdotal

17   testimony that says the chief had a diversity goal in

18   mind.

19           THE COURT:   Right.

20           MR. GODFREY:   And the jury is going to hear that.

21   They are going to hear apparently testimony from Rice and

22   Anthony Davidson.

23           My expert is going to come in and say essentially

24   that even if that were the case, looking at the numbers as

25   they came out, there is no statistical significance to the

1  choices he made, there is no suggestion of discrimination in

2  what he did.

3          THE COURT:  Was there a motion *in limine* to exclude

4  the defendant's expert?

5          MR. COFFMAN:  No, but they are the ones who asked

6  to keep all statistical evidence out.

7          THE COURT:  Yeah.

8          MR. COFFMAN:  And I would say that I have never

9  heard of statistics being used as an affirmative defense of

10 some kind in a case without at least the presentation from

11 the plaintiff to be rebutted.  It would be very unusual to

12 ask a jury to draw conclusions from that.

13         THE COURT:  I would say I have the same opinion

14 about that.

15         And you will have to decide how you want to

16 litigate this, but as I found for the plaintiffs' expert,

17 I just don't think you need an expert to reach that expert

18 opinion that there is no statistical evidence.

19         I mean, you have got a bunch of people who have

20 been in the workforce for a long time.  Show them the numbers

21 and let them decide whether or not -- and I have allowed

22 plaintiffs to do that if they want, and I guess the

23 defendants could do it.

24         But just show them the numbers.  Let them decide.

25         MR. COFFMAN:  I will also say that their expert

1    is not on their will call list that was submitted to the

2    Court.  This is the first time I have ever heard about

3    this.

4              THE COURT:  Well, I do hold people to -- you know,

5    I make you represent to me, especially at this point, as to

6    who your witnesses are going to be.

7              And I think for the defendant, you have one

8    witness?

9              MR. GODFREY:  Right, and that's the only will

10   call.

11             THE COURT:  No.  You are instructed to tell me who

12   it is that you are going to call in your case in chief.  You

13   don't have a rebuttal case.

14             MR. GODFREY:  I believe that the instruction we got

15   from Ms. Birnbaum was to tell you who the will call witnesses

16   are.

17             THE COURT:  Yeah, who are you going to call, and

18   that person is not on this list.

19             MS. TERRY:  That wasn't our understanding of what

20   she was requesting.  We usually deal with will call and may

21   call just depending on the plaintiffs' case.  So that wasn't

22   our understanding.

23             There are other witnesses that we may call just

24   depending on what --

25             THE COURT:  Well, I will tell you, you are the only

1    litigants that have ever had that confusion, ever.

2           And I will go back and look at the e-mails that go

3    out, but I suspect that you were told, because the purpose of

4    this is for me to manage the trial, is to tell me who you

5    intend to call in your case in chief.

6           And we are not playing this little game where

7    you are hiding some other people.  I want everybody -- this

8    is a civil case.  I want everybody to know, and I want that

9    to be done by the end of the day today so that they can

10   prepare.

11          Because if what you are saying there is there's one

12   person that we put there, but we have seven other people that

13   we are thinking about calling, it's time to do that.  And if

14   that's the game we are playing here, we are going to put a

15   stop to it.

16          MR. GODFREY:  I apologize if you feel that we

17   were trying to play a game.  We are not.  A lot of what we

18   needed to do depended on your rulings on the motions

19   *in limine*.

20          THE COURT:  Well, I'm going to tell you

21   something.  You are not going to get rulings on all of it,

22   because I will tell you, I thought the briefing was

23   terrible.  It's hard to rule based upon the submissions I got

24   from either side.

25          And so I have tried to be as nice about this as

1   I can, and I don't want to put time aside to do what we may

2   have to do, which is to hold these proffer sessions.  But it

3   seems to me that you have a pretty good idea of what they

4   want to do, and you have a pretty good idea of what -- they

5   listed their witnesses and what they are going to say.  It's

6   time to get this case prepared for trial, and I need to know

7   who you are going to call.

8          You can always take people off it, but I want to

9   know what your case is.

10          And I suspect that your case is more than

11   Mr. Rubin, from what I hear now.  And it didn't necessarily

12   depend upon my rulings on the motions *in limine*.

13          MR. GODFREY:  Well, the only other witness I can

14   even contemplate other than the expert who might need to be

15   called at this point is the chief operating officer, because

16   I believe there is going to be testimony she gave

17   instructions as to Anthony Davidson.

18          THE COURT:  This is Lynette Young?

19          MS. TERRY:  Yes.

20          MR. GODFREY:  Yes.

21          MR. COFFMAN:  We do not intend to elicit that

22   testimony from Mr. Davidson, if that's your concern.

23          THE COURT:  I will tell you what you ought to do is

24   you ought to have a discussion about this case.

25          This case has been pending since 2007.  It's gone

1    through more than one judge.  I'm doing the very best I can

2    to get you to try this openly and fairly, and you ought to

3    have a discussion about what your cases are.

4         It's not going to change anybody's testimony, and

5    it will do what I want to do, which is to serve the jurors

6    and give them information in the most efficient way

7    possible.

8         So -- and this is a perfect example:  I want to

9    call Lynette Young because I want them to respond to

10   this.  Now, I will tell you from reading the papers, that

11   I assumed that that's what you wanted to do.  But if you are

12   not going to do that, you ought to tell each other that.

13        MR. COFFMAN:  I agree.

14        THE COURT:  Because right now that means that

15   testimony won't come in and you won't have to call her, and

16   we have saved an hour.  Not for me, of course; it's for the

17   jurors.

18        Look, the issue in this case is simple, and it's

19   going to rely upon the credibility of people.

20        And it's an interesting case for me.  I have had

21   lots of discussions with Kevin about it.  It's an interesting

22   area of the law.

23        And it's going to be tried.  Whatever happens,

24   happens, and I just want it to happen in a way that honors

25   the time of the jurors and that it does what I think -- the

best chance of getting a just result for both sides on this

is to have an honest, fair, objective presentation of the

facts.  I think that's what the system requires and I think

that's what these jurors are going to demand.

MR. COFFMAN:  I hesitate to bring up other

issues we weren't able to resolve because I know that's what

we should be doing, but my next issue would be -- I may have

notified Ms. Birnbaum about Michael Beckman, who is one of

the plaintiffs.  He is living in Florida right now because

his father is in the hospital, and he's taking care of his

mother while his father is in the hospital.

I expect him to be here for trial, so this may not

be an issue.  If we were bifurcating it, there may have been

an issue with him having to come back twice, and I don't

think he would be able to do that.

But my concern with that situation is if I can't

call him for his damages sort of testimony, then there would

be the need for some kind of deposition to preserve that

testimony.

THE COURT:  Well, was he deposed?

MR. COFFMAN:  He was deposed, but I don't think he

was ever asked about his lost wages --

MR. PANKEY:  He was not asked.

MR. COFFMAN:  -- or questions like that.

But like I said, I do anticipate --

1          THE COURT:  Well, could you stipulate to that?

2          MS. TERRY:  Your Honor, we have offered a lot of

3    stipulations that were not accepted.

4          THE COURT:  Well --

5          MR. COFFMAN:  That's not -- well, we don't have to

6    decide this, but I'm happy to continue working with that, if

7    we can.

8          THE COURT:  On this, if -- this is the way it will

9    play out.  We now know these people are going to testify.  If

10   you say at the very end, we explain to them that his father

11   is sick, that he would otherwise be here except for an

12   illness to a parent, but that the parties have stipulated as

13   to the following, which you have now heard *ad nauseam* from 23

14   other people, and that his numbers are X, the jury would

15   appreciate it.

16         And if they got a sense that he was being abused

17   and had to come up here and leave his father, they will hold

18   that against whomever did that.

19         That seems to me to be a reasonable resolution.

20   I'm not saying it's the one that you should adopt.  But if

21   you have to, if you can't reach an accommodation, somebody

22   file a motion, and I will decide whether or not during the

23   course of the trial, I can distract two of you so that you

24   could take a short deposition so you can get in this sort of

25   testimony.

1          But hopefully I won't have to decide that and you

2    will find some reasonable accommodation.

3          MR. COFFMAN:  Lastly -- well, I have got two more

4    things.

5          THE COURT:  But I'm assuming on him that it's only

6    damages and that you are not going to try to get substantive

7    testimony as to liability from him?

8          MR. COFFMAN:  Correct.  But I do anticipate, like

9    I said, he will be able to make it, but my only concern was

10   if it were bifurcated and he couldn't make it back for a

11   second trip, then I wouldn't be able to get in that

12   testimony.

13         As the Court is aware, Mr. Dycus is in bankruptcy,

14   so his trustee has been substituted as the plaintiff.  I do

15   not intend to have the trustee present during the trial, and

16   I wanted to make sure that was okay with the Court and the

17   defendants.

18         THE COURT:  What do the defendants think about

19   that?

20         MR. GODFREY:  I see no need for him to be here.

21         THE COURT:  I don't either.

22         MR. COFFMAN:  He just wanted me to make sure he

23   didn't have to be here.

24         And the last thing was, you know, the plaintiffs in

25   this case submitted -- both sides submitted exhibit lists

```
 1    and, as always happens before a trial, some things get

 2    reshuffled, and I wanted to -- I am going to sort of send

 3    some renumbered exhibits -- not new exhibits, but renumbered

 4    exhibits to the other side.

 5          And I just wanted to make sure we are all on the

 6    same page with that.  Nothing new, just new numbers.

 7          THE COURT:  Okay.  You ought to do that by the end

 8    of the day on Wednesday.

 9          When you introduce exhibits, this is what would

10    help me.  Just a couple practice suggestions.

11          If there is a witness that's going to go

12    through let's say ten documents, those ten documents in

13    the order in which you intend to examine them ought to be

14    put on the witness stand so we don't have this going back

15    and forth.

16          Second, when you do that, a set of those

17    documents ought to go to opposing counsel.  Even though

18    you have given them those before, they don't know your final

19    decision on which ones you are actually going to use, and if

20    they say I need to find that in this morass of other

21    information, I will let them do that, and it will slow things

22    down.

23          And I want a copy myself, because I take notes on

24    them.

25          So if you think about that, so the witness has
```

them, the defense counsel has them or the plaintiffs' counsel
has them and I have them, and the examination then is
conducted from the podium and we don't have people going back
and forth.

It's a big courtroom.  My belief is that everybody
who watches this is entitled to hear everything that goes
on.  That's why we call them public trials.  And if you are
close to the witness stand asking questions, the audience
won't hear that.  And it wouldn't surprise me if this was
covered by the press, so they are entitled to know what is
going on.  So examinations should be conducted from the
podium.

There are some lawyers that like to be at the end
of the jury box.  I'm uncomfortable with lawyers being that
close to jurors, and there is no microphone back there.   So
I end up having a hard time hearing the questions, as the
witness often does.

So examinations should be conducted from the podium
where there is a great microphone system.

MR. COFFMAN:   And my last thing would be in this
submission, both sides offered to the Court to resolve
several issues including our initial motion *in limine*.

There is a list of sort of agreements, parties'
agreements for trial, and there is a list of A through G or
A through H of things that we agreed we would and would not

1    do.

2            And I would only ask that we -- I'm assuming

3    that's still part of the situation; otherwise, the trial

4    changes?

5            THE COURT:  Well, I haven't looked at that.  Have

6    you looked at that?

7            I will look at that this afternoon and get back to

8    you.  I assume if it's a joint agreement, that you still have

9    to agree with each other.  The question is whether I agree

10   with you.

11           MR. COFFMAN:  Right, that's fair.

12           THE COURT:  Do you have the docket entry for that

13   one by chance?

14           MR. COFFMAN:  This was -- the Court requested we

15   submit this prior to the last conference we had.

16           THE COURT:  And did we file it, though?

17           MR. COFFMAN:  It was not filed.

18           THE COURT:  All right.  We will find that.

19           What else?

20           MR. COFFMAN:  That's all for the plaintiffs.

21           THE COURT:  There has to be some questions.  I like

22   to have some question parity here.  But actually if not, you

23   get more credit if you don't ask any questions.

24           MR. GODFREY:  No, I think we are fine.

25           THE COURT:  All right.  So you have got some

1    deadlines, immediate deadlines that have to be

2    met.  Otherwise, we will see you on Monday here at 9:15 or so

3    so we can start right at 9:30.

4              All right.  Thank you.

5                   (Proceedings adjourn at 3:52 p.m.)

```
1                      C E R T I F I C A T E

2


3    UNITED STATES OF AMERICA      :
                                    :
4    NORTHERN DISTRICT OF GEORGIA   :

5
              I, Nicholas A. Marrone, RMR, CRR, Official Court
6
     Reporter of the United States District Court for the Northern
7
     District of Georgia, do hereby certify that the foregoing 75
8
     pages constitute a true transcript of proceedings had before
9
     the said Court, held in the city of Atlanta, Georgia, in the
10
     matter therein stated.
11
              In testimony whereof, I hereunto set my hand on
12
     this, the 9th day of October, 2013.
13

14

15

16
                              /s/ Nicholas A. Marrone
17                            _____
                              NICHOLAS A. MARRONE, RMR, CRR
18                            Registered Merit Reporter
                              Certified Realtime Reporter
19                            Official Court Reporter
                              Northern District of Georgia
20

21

22

23

24

25
```